Mark SWANK; Marvin Chudnoff; Jeffrey Sussman; Louis Dreyfus Natural Gas Holdings; L.D.E. Associates, L.L.C.; and James McCoy, Jr., Appellants/Appellees,

v.

Anatoly SVERDLIN, Individually and Derivatively on Behalf of Automated Marine Propulsion Systems, Inc., Appellees/Appellants.

No. 01–99–00428–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Sept. 4, 2003.

Rehearing Overruled Nov. 7, 2003.

David J. Beck, Beck, Redden & Secrest, Jennifer Horan Greer, Kathy D. Patrick, Gibbs & Burns, L.L.P., Houston, David E. Keltner, Jose, Henry, Brantley & Keltner, Fort Worth, K. Chris Todd, Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C., Washington, DC, Jack O'Neill, Byron C. Keeling, Clements, O'Neil, Pierce & Nickens, Frank G. Jones, Fulbright & Jaworski, Larry R. Veselka, Smyser, Kaplan & Veselka, L.L.P., Houston, Brendan V. Sullivan, Jr., John J. Buckley, Jr., Paul Mogin, Williams & Connolly LLP, Washington, D.C., for Appellant.

Alice Oliver-Parrott, Maria Teresa Arguindegui, Burrow & Parrott, L.L.P., John L. Hill, Mallory Wade Turner, Locke Liddell & Sapp LLP, Kevin McEvily, McEvily & Flowers, Houston, James E. Essig, Webster, for Appellee.

Panel consists of Justices HEDGES, JENNINGS, and EVANS.*

## OPINION

ADELE HEDGES, Justice.

In this commercial dispute, Mark Swank, Marvin Chudnoff, Jeffrey Sussman, Louis Dreyfus Natural Gas Holdings Corp., L.D.E. Associates, L.L.C., and James McCoy, Jr. appeal a judgment in favor of Anatoly Sverdlin individually and derivatively on behalf of Automated Marine Propulsion, Systems, Inc.[1] We reverse and render.

## Background

Anatoly Sverdlin, an engineer, came to Houston in 1974, after defecting from the Soviet Union. In 1977, he started his own business, Automated Marine Propulsion Systems, Inc. ("AMPS"), which primarily repaired diesel marine engines on large ships. Sverdlin was the sole owner and chief executive officer ("CEO") of AMPS. Between 1992 and 1994, AMPS's net income was approximately $110,000. Thereafter, Sverdlin developed and secured a series of three patents for a new fluid control injection system ("FCIS"), which allegedly improved engine efficiency and lowered costs. Sverdlin obtained certification from several international marine classification societies to enable owners of oceangoing vessels with FCIS to obtain insurance. FCIS was installed on numer-

---

* The Honorable Frank Evans, former Chief Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

1. The parties present numerous issues in their briefs, including new issues within other issues or in footnotes. Issues that are not appropriately before this Court for appellate review are waived. TEX.R.APP. P. 38.1(e), (h), 38.2(a)(1).

ous engines and underwent testing in Japan at the end of 1994. To further develop the FCIS, AMPS shifted its focus away from engine repairs, and in 1995, the company began to operate at a loss. AMPS lost over $125,000 in 1995. Sverdlin obtained a bank loan, but additional capital was required. A business plan was needed to attract investors.

In early 1995, James McCoy was hired as vice-president of industrial sales to promote FCIS. A few months later, Mark Swank was hired as president of AMPS to develop a business plan to attract investors. Swank and McCoy each received a salary and yearly stock options, the total of which was not to exceed 20% each.

Swank prepared a five-year financial projection of AMPS's potential net income, assuming FCIS was successful. The projections, based on a 1% market share, estimated that AMPS would receive approximately $120 million in revenue over five years, which would result in approximately $50 million in post-tax revenue for AMPS.[2] In late 1995, McCoy introduced Sverdlin to an investor, Marvin Chudnoff. Chudnoff was interested in investing in AMPS, and he recruited additional investors.

Chudnoff and three other individuals created AMPS Investment, L.L.C. Subsequently, AMPS Investment, L.L.C. created L.D.E. Associates, L.L.C. ("LDE"), through which AMPS Investment, L.L.C. and Louis Dreyfus Natural Gas Holdings Corp. ("LDNGH") invested in AMPS. Jeffrey Sussman, one of AMPS Investment, L.L.C.'s members, signed documents as LDE's president.

Lengthy negotiations ensued over several months regarding a deal for AMPS to obtain a $2 million loan from LDE to continue development and marketing of FCIS. During the negotiations, Chudnoff often spoke on behalf of the investors, and Swank often spoke on behalf of AMPS.[3]

A letter agreement was signed on June 6, 1996 ("the June Letter Agreement"). Sverdlin testified that he did not read the June Letter Agreement when he signed it, and its terms were not what he was led to believe. However, both Sverdlin and his wife, the directors of AMPS at the time, signed a statement giving the AMPS board's approval to the June Letter Agreement.

The parties continued to negotiate the agreement through September. The investors conducted due diligence on AMPS and hired an engineering firm to evaluate AMPS and FCIS. The due diligence investigations revealed that a few terms in the September contracts varied slightly from those in the June Letter Agreement. The parties signed a series of related documents and finalized the transaction at the end of September 1996. Sverdlin chose not to read the documents prior to signing them because he had to catch an overseas flight.

Under the loan agreement, LDE had the right to choose two of the three directors at AMPS. Chudnoff and Sussman became such directors. Shortly thereafter, FCIS did not function as expected, AMPS lost money, and the parties began to disagree. Appellants testified that Sverdlin became hostile to employees and customers, blaming them for FCIS's prob-

---

**2.** Plaintiffs' expert witnesses based the damage valuation of AMPS on these projections.

**3.** The investors and AMPS were represented by counsel. Gardere, Wynne, Sewell & Riggs ("Gardere Wynne") represented AMPS.

Sverdlin's wife, an attorney, also reviewed the documents. Swank hired Gardere, Wynne in March of 1996 to represent AMPS. The jury found that Gardere, Wynne represented both Sverdlin and AMPS.

lems. In mid-December, appellants asked Sverdlin to concentrate on engineering concerns and to not speak to customers. Sverdlin testified that the board of directors stopped listening to him, intervened in AMPS's business operations, and took control of the company, causing it to go into disarray and become unmanageable. The situation continued to escalate.

After several board meetings and discussions, the parties could not agree on how to run AMPS and could not work together. Sverdlin insisted the company would not survive without him. He threatened to fire Swank and McCoy and take back his patents.

Swank and McCoy exercised their stock options in AMPS. The AMPS board determined that Sverdlin's conduct was damaging the company in violation of his employment agreement. They terminated his employment with AMPS on January 16, 1997. The company had been operating at a loss. AMPS's net income after taxes in 1996 revealed over half a million dollars in losses. AMPS borrowed additional money directly from LDNGH.

After his termination, Sverdlin and the AMPS board continued to disagree. AMPS and LDE obtained a temporary restraining order, and, subsequently, a temporary injunction against Sverdlin enjoining him from: physically threatening AMPS's officers and employees; contacting customers to disparage its business; entering the premises of AMPS and disrupting its activities; taking AMPS equipment/technology/customer lists; contacting marine classification societies in connection with AMPS; or terminating AMPS's directors and employees.

Sverdlin filed a counterclaim individually and on behalf of AMPS in his derivative capacity seeking declaratory relief and alleging numerous causes of action, including fraud, breach of contract, breach of fiduciary duty, negligence, gross negligence, conspiracy, tortious interference, and usury. Sverdlin asserted that he was never informed about certain aspects of the negotiations and did not understand the documents he had signed. Subsequently, the trial court modified the injunction to freeze all of the parties' contractual rights related to the June and September 1996 agreements and appointed a receiver to oversee AMPS's operations. Thus, the documents were frozen in escrow. The trial court also realigned the parties by making Sverdlin and AMPS the plaintiffs.

Sverdlin had sued Gardere Wynne and one of its attorneys, David Jungman, alleging malpractice based on conflicts of interest. Those claims were settled for a confidential amount. The jury awarded approximately $1.5 billion to Sverdlin and AMPS. Following several post-verdict hearings, the Honorable Judge Dwight Jefferson disregarded numerous findings, reduced the verdict to approximately $235 million in damages, and returned the patents and 100% of AMPS's stock to Sverdlin. After Judge Jefferson resigned, the case was transferred to the Honorable Judge Tracy Christopher. After several post-judgment hearings, Judge Christopher remitted a portion of the punitive damages, further reducing the judgment to approximately $180 million.

## Standards of Review

Many of appellant's issues assert that the evidence is legally and factually insufficient to support many of the jury findings.

We follow the usual standards of review. In reviewing a legal sufficiency challenge, we consider all the evidence in the light most favorable to the verdict and indulge every reasonable inference deducible from the evidence in the prevailing party's favor. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). In reviewing a factual sufficiency challenge, we

consider all the evidence both supporting and contrary to the jury's finding. *Plas-Tex., Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989).

## Usury

### *The Jury Questions*

The issues of usury liability and damages were set forth in jury questions 50 and 51 as follows:

### QUESTION NO. 50

Do you find by clear and convincing evidence that any of the following elements constitute a charge of interest to [AMPS] on September 20, 1996, for the $2 million loan?

| | |
|---|---|
| a) the patent assignment | YES |
| b) the 30% option | YES |
| c) the 50% option | YES |

"Interest" is the compensation allowed by law for the use or forbearance or detention of money.

### QUESTION NO. 51

What do you find to be the value of the items found by you to constitute interest in response to Question No. *50?*

Answer in dollars and cents, if any, as to each of the following.

| | |
|---|---|
| a) the patent assignment | $ 26.4mm |
| b) the 30% option | $ 330,000 |
| c) the 50% option | $ 550,000 |

AMPS contends that, in addition to the prime rate of interest as consideration for making a $2 million loan, LDE contracted for the patent assignment, the 30% option, and the 50% option—which the jury found to equal over $26 million in usurious interest. The jury found that the patent rights

and stock options were compensation for the use of money. The trial court rendered judgment against LDE and LDNGH for usury, holding that AMPS (based on Sverdlin's derivative claims) was entitled to recover against LDE and LDNGH (by virtue of piercing the corporate veil) for about $74 million.

### *The Law*

██ A usurious transaction is composed of three elements: (1) a loan of money; (2) an absolute obligation to repay the principal; and (3) the exaction of a greater compensation than allowed by law for the use of the money by the borrower. *First Bank v. Tony's Tortilla Factory, Inc.*, 877 S.W.2d 285, 287 (Tex.1994). "Interest" means compensation for the use, forbearance, or detention of money. TEX. FIN.CODE ANN. § 301.002(a)(4) (Vernon Supp.2003). "Usurious interest" is interest that exceeds the applicable maximum amount allowed by law. TEX. FIN.CODE ANN. § 301.002(a)(17) (Vernon Supp.2003). Usury statutes are penal in nature and should be strictly construed. *Tony's Tortilla*, 877 S.W.2d at 287.

██ Whether an amount of money is interest depends not on what the parties call it but on the substance of the transaction. *First USA Mgmt., Inc. v. Esmond*, 960 S.W.2d 625, 627 (Tex.1997). Not every obligation on a borrower in connection with a loan is interest. *Id.* For example, fees which are an additional charge supported by a distinctly separate and additional consideration, other than the simple lending of money, are not interest and thus do not violate the usury laws. *Id.*[4] Courts will look beyond the form of the transaction to its substance in determining the existence or non-existence of usury. *Gon-*

---

**4.** Several Texas cases have recognized that certain charges are not considered interest. *See Tony's Tortilla*, 877 S.W.2d at 287 (bank's fee); *Texas Commerce Bank–Arlington v. Goldring*, 665 S.W.2d 103, 104 (Tex.1984) (at-

torney's fees); *Stedman v. Georgetown Sav. & Loan Ass'n*, 595 S.W.2d 486, 489 (Tex.1979) (commitment fee); *Southland Life Ins. Co. v. Egan*, 126 Tex. 160, 86 S.W.2d 722, 724–25 (1935) (prepayment penalty).

zales County Sav. & Loan Ass'n. v. Freeman, 534 S.W.2d 903, 906 (Tex.1976). A court will not hold a contract in violation of usury laws unless, upon reasonable interpretation of all terms, it is clear the intention of the parties was to charge more interest than allowed by the law. Smart v. Tower Land & Inv. Co., 597 S.W.2d 333, 341 (Tex.1980).

A fact question is raised when there is any dispute in the evidence as to whether a charge in addition to interest is actually for an additional consideration. Texas Commerce Bank–Arlington v. Goldring, 665 S.W.2d 103, 104 (Tex.1984). When there are no disputed facts, however, courts have determined as a matter of law whether a charge is additional interest for the lending of money or for separate, additional consideration. Id. (holding that attorneys' service, consideration in addition to lending money, was not interest); Tony's Tortilla, 877 S.W.2d at 287–88 (holding as a matter of law that bank's fees were not interest).

### The Facts

LDE loaned AMPS $2 million for 5 years, with interest accruing at an annual rate equal to the stated prime rate. Initially, Sverdlin pledged 30% of the AMPS stock to secure the loan. LDE acquired an option to purchase 30% of AMPS stock from Sverdlin, Swank, and McCoy pro rata. LDE acquired an option to purchase an additional 50% in AMPS.

Additionally, Sverdlin assigned his patents to LDE, which simultaneously licensed them to AMPS on a royalty-free basis. The investors initially wanted the patents assigned to AMPS to protect their loan to AMPS. Sverdlin voiced concern about a direct assignment to AMPS because a creditor of AMPS retained a prior first lien on AMPS's property. Sverdlin wanted to avoid any prospect of a lender asserting a lien on his patents. Accordingly, the patents were assigned to LDE with heavy encumbrances to protect Sverdlin's rights. For example, LDE could not use the patents. The Patent Assignment states, "Assignee [LDE] shall not use the Patent Rights itself or license or assign the Patents or any interest therein to anyone other than AMPS." The Patent Assignment also states that if AMPS ceases operation using the technology covered by the patents, then assignee (AMPS) shall reassign such patent rights to assignor (Sverdlin).

- LDE ➜ loaned $2 million to ➜ AMPS;

- LDE ⬅ received assignment of patent from ⬅ Sverdlin; and

- LDE ➜ gave royalty-free license of patent to ➜ AMPS.

### AMPS's Theory to Support Usury

AMPS argues that LDE and LDNGH "required—as compensation for a $2 million loan to AMPS—that Sverdlin assign his FCIS patents to LDE, that Sverdlin grant LDE two options that would allow LDE to purchase 80% of AMPS's stock, and that AMPS pay interest on the loan at the prime rate." According to AMPS, LDE contracted for an assignment of the patents from Sverdlin with an immediate, exclusive, and royalty-free license to AMPS, thereby charging AMPS the value of the patents as interest, which resulted in usury.

### Legal and Factual Sufficiency for Usury

Appellants LDNGH and LDE contend that the evidence is legally or factually insufficient to support the jury's findings regarding the value of the patent assignment.

#### $26.4 million reduced to $25.4 million

As noted above, the jury valued the patent assignment at $26.4 million; however, Sverdlin subsequently agreed to reduce this amount to $25.4 million. There is no evidence in the record to support the verdict of $26.4 million because Sverdlin's expert testified that the value of the patent assignment was $25.4 million. Therefore, Sverdlin's motion for judgment reduced the value to $25.4 million. Sverdlin's counsel stated, "The testimony from the witness stand on behalf of the experts, both of them, was that the patents independently had a value of 25.4 million dollars. And that number is reflected in our motion for judgment. We have reduced the jury verdict to that to conform it to the specific evidence that came on as to the value of the patents." Accordingly, we examine whether the evidence was sufficient to support the $25.4 million valuation of the patent assignment.

#### Valuation of the Patent

Sverdlin presented two expert witnesses, Robert Hancock and Saul Solomon, both licensed CPA's. Hancock testified about the value of the patent and Solomon testified about the value of the patent assignment.

Hancock determined that the value of the patent was $25.4 million. He used a complicated financial process that was based on Swank's financial predictions.[5] Specifically, Hancock used the June Letter Agreement written by Swank, which contained a five-year projected income statement for 1996 through 2000. Hancock explained, "I looked at the five-year projections and ascertained that they were-AMPS was expected to earn a significant amount of money gradually building up over the five-year period to about $27 million per year." Swank's projected net income after taxes for these five years are as follows:

| | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|
| Net income after taxes | ($351,427) | 627,237 | 4,003,866 | 10,115,776 | 27,716,202 |

Hancock assumed that in 2000, the projected net income would level off and would continue at a zero growth rate for the next five years.[6] He explained that "when we got to the year five, I presumed that they would level off at the level of sales and, thus, net income that they had achieved in year five and it would go out into perpetuity, forever." This assumption results in the following net incomes after taxes:

| | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|
| Net income after taxes | $27,716,202 | 27,716,202 | 27,716,202 | 27,716,202 | 27,716,202 |

Taking inflation into account, Hancock used a projected interest rate to discount

5. The financial predictions contained in AMPS's business plan were prepared as a marketing tool to solicit outside investors. They extended out for a five-year period.

6. This calculation is similar to a perpetuity calculation, holding the year 2000 net income figure as a constant income stream into infinity. At year 10, the cash flow is worth a relatively small amount after it is discounted back to present value.

each of the ten cash flows back to their present value, or their value in 1996 dollars. He added those ten present values and reached a net present value of $26,900,000, which he said represented the present value of AMPS's net income cash flows for ten years. Based on these calculations, Hancock opined that the value of AMPS's business in 1996 was $26,900,000.

However, the $26,900,000 amount included the value of the patents *and* AMPS's $1.5 million "topside repair business" that generated income from service and repairs. Therefore, Hancock subtracted $1.5 million to reach his final determination of $25,400,000 as the value of the patents.

$$
\begin{array}{ll}
26{,}900{,}000 & \text{(Total present value of AMPS)} \\
-\ 1{,}500{,}000 & \text{(Value of top side repair business)} \\
=\ 25{,}400{,}000 & \text{(Value of patent)}
\end{array}
$$

### Valuation of the Patent Assignment

Solomon testified that the value of the patent assignment was equal to the value of the patent. During cross-examination, AMPS's counsel questioned Solomon about the heavy encumbrances on the patent assignment. For example, LDE could not use the patent rights itself, nor could it license or assign the patents to anyone other than AMPS. Additionally, if AMPS ceased operation using the technology covered by the patents, then LDE was required to reassign the patent rights to Sverdlin.

Solomon opined that, despite such encumbrances, LDE received the full value of the patents because LDE was a controlling shareholder in AMPS. Solomon testified as follows:

> [AMPS's counsel]: It says [referring to Patent Assignment], "Assignee shall not use the patent rights itself or license or assign the patents or any interest therein to anyone other than AMPS."... Given that language, what value does LDE have as a result of assigning patents when they can't use it themselves, they can't license anybody but AMPS?
>
> Solomon: Well, the value that they have is attributed to them through their control of AMPS. The fact that they control both the assignor and the assignment made between LDE Associates and AMPS which is the second part of this transaction. They control both—LDE Associates control both the licensing and the use of those patents. To give you an example, AMPS has the ability to license these patents to other companies. As long as AMPS is receiving a license fee of some amount, they have the ability to do that. AMPS could turn around and license these patents to another affiliate of Louis Dreyfus, any one of the companies, or anybody they so choose to and both sides of that transaction are controlled by the same people, the LDE Associates, Louis Dreyfus Natural Gas Corporation.
>
> [AMPS's counsel]: Well, that hasn't happened, has it?
>
> Solomon: [N]ot to my knowledge have they licensed the patents to a third party or to another Louis Dreyfus company.
>
> [AMPS's counsel]: In fact, they licensed the patents back to AMPS, didn't they?
>
> Solomon: Well, they did; but that did not preclude them from licensing it to another person. They controlled both sides—
>
> [AMPS's counsel]: LDE can't license the patent to anyone else?
>
> Solomon: No, LDE cannot but AMPS can—....

[AMPS's counsel]: And AMPS could license to someone else and receive the money? . . . . And who owns AMPS?

Solomon: AMPS is owned primarily by LDE—I'm sorry, AMPS is owned—right now the contention, as a part of this lawsuit, is the stock is still in the name of Mr. Sverdlin.

[AMPS's counsel]: At the time this loan agreement was signed in September of '96, who owned the stocks in AMPS?

Solomon: Mr. Sverdlin owned the stock at that time.[7]

[AMPS's counsel]: 100 percent, correct?

Solomon: That's correct.

[AMPS's counsel]: So, who received the value if AMPS at that time were to license the patents?

Solomon: You're missing the point. AMPS could license those patents for a dollar to another Louis Dreyfus control company who would receive all the benefits, all of the economic benefits of those patent rights or they could assign it back—they can't assign it back to LDE according to the document. But there are other markets and other applications that they could also license to other third parties and receive the benefits of that.

[AMPS's counsel]: But that hadn't happened at that time, had it?

Solomon: It had not happened at that time.

[AMPS's counsel]: Hadn't happened to date?

Solomon: Not that I'm aware of.

[AMPS's counsel]: But your testimony is that LDE got $25,400,000 of value at the time this loan agreement was closed?

Solomon: As the value of the patent rights that were assigned to them in this transaction, yes.

Solomon thus posited that the patents assignment had value to LDE "through their control of AMPS." Solomon explained that, although LDE could not sell the patents, LDE did control AMPS, and AMPS could "turn around and license these patents to another affiliate of Louis Dreyfus, any one of the companies, or anybody they so choose." Therefore, AMPS asserts, LDE received the full value of the patents because LDE was a controlling shareholder in AMPS.

We reject this view. If LDE requests this Court to disregard the corporate structure on the patent assignment, then we would also have to disregard the corporate structure as to the loan itself. In other words, if LDE fully controls AMPS with regard to the restrictions on the patent assignment, then LDE could disregard its $2 million loan to AMPS, and instead consider the $2 million as a capital investment. AMPS cannot have it both ways.

■ A usurious transaction is tested not by what the debtor parts with, but rather by what the creditor receives. *Stewart v. Briggs*, 190 S.W. 221, 222 (Tex.Civ.App.-Texarkana 1916, no writ). The value of the patent assignment is based on the value received by LDE, including the encumbrances. LDE did not have the right to sell or even use such patents pursuant to the assignment; therefore, LDE did not benefit from the full value placed on the patents.

■ We hold that the value of the patents does not equate to the value of the patent assignment. Because the jury had no evidentiary basis on which to base its

7. At the time of the patent assignment, Sverdlin was the owner of 100% of the stock; however, the option agreement granted a 30% option to LDE, and a 50% option to an affiliate of LDE.

valuation of the patent assignment, we must disregard the finding. The value of the patent assignment is crucial to Sverdlin's usury claim. The $2 million loan, even with the prime interest rate and the values the jury found for the stock options, cannot be considered usurious without considering the patent assignment.

We reverse the judgment of the trial court with regard to usury and render judgment that AMPS take nothing on its usury claim.

Because AMPS cannot recover for usury, we do not reach the remaining arguments by LDE and LDNGH, which included: transfer by a third party, savings clause, contingency, uncertain or speculative value, and notice. We do not reach LDNGH's arguments that it cannot be liable for usury when it was not the lender and did not charge for, contract for, or receive usurious interest; nor can it be liable for usury under the veil-piercing theory. We also do not reach LDE's arguments challenging the legal and factual sufficiency of the evidence in support of the jury's actual damage award for usury and the application of the statutory cap to punitive damages for usury. Nor do we reach Sverdlin's cross-appeal challenging the trial court's calculation of the usury penalty.

## Breach of Fiduciary Duty

### The Jury Questions

The issues of breach of fiduciary duty and resulting damages were set forth in jury questions 16 and 17 as follows:

### QUESTION NO. 16

Did any of the following individuals breach a fiduciary duty to [AMPS]?

Answer "yes" or "no" as to each of the following

| | YES | NO |
|---|---|---|
| a) Mark Swank | √ | |
| b) Jim McCoy | √ | |
| c) Jeffrey Sussman | √ | |
| d) Marvin Chudnoff | √ | |

You are instructed that an officer or director of a corporation owes a fiduciary duty to the corporation and the shareholders collectively. You are instructed that the fiduciary duty that is owed by an officer or director of a corporation includes the duty of loyalty, the duty of obedience, and the duty of due care.

Where a fiduciary relationship exists, the burden is on the fiduciary to show that he acted fairly and informed the beneficiary of all material facts relating to the challenged transaction.

### QUESTION NO. 17

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate [AMPS] for its damages, if any, that were proximately caused by such breach of fiduciary duty?

Answer in dollars and cents, if any.

| | |
|---|---|
| a) Mark Swank | $5 mm |
| b) Jim McCoy | $5 mm |
| c) Jeffrey Sussman | $5 mm |
| d) Marvin Chudnoff | $5 mm |

### AMPS's Theory to Support Breach of Fiduciary Duty

AMPS contends that Swank breached his fiduciary duty because he was an integral part of the "scheme to steal the FCIS technology, seize control of AMPS, run it at a loss, and profit at the company's expense." It argues that Chudnoff and Sussman breached their fiduciary duties because they "defrauded their way onto AMPS's Board, seized control of the company, created incentives to profit personally as the company's value fell, and proceeded to run it at a loss. As directors of AMPS, part owners of LDE, and individu-

al owners of the 50% option, their interests were consistently in conflict."

### Damages for Breach of Fiduciary Duty

The trial court disregarded the jury's answers with regard to McCoy and assessed damages against Swank, Sussman, and Chudnoff. First, we will address McCoy, then we will turn to the sufficiency of the evidence to support the damage award for the alleged breaches by Swank, Sussman, and Chudnoff.

### McCoy

■ In a cross-point, AMPS contends that the trial court erred in disregarding the jury's finding that McCoy breached his fiduciary duty to AMPS. Specifically, AMPS appealed the court's disregard of the jury's finding to the liability question regarding breach of fiduciary duty by McCoy, as set forth above in Jury Question 16. AMPS did not raise as error on appeal the court's disregard of the damages question, Jury Question 17, which awarded AMPS $5 million for McCoy's breach of fiduciary duty. AMPS's brief on appeal does not challenge this damage question.[8] Accordingly, AMPS waived any error as to McCoy. Tex.R.App. P. 38.1.

### Swank, Sussman, and Chudnoff

■ The judgment awarded AMPS damages for breach of fiduciary duty in the amount of $5 million each against Swank, Sussman, and Chudnoff, for a total of $15 million. Swank, Sussman, and Chudnoff contend that the evidence is insufficient to support the damage award.

AMPS responds that the $20 million total award (this figure includes the jury's $5 million award against McCoy, which was later set aside) was less than what the evidence established as the maximum amount of damages available for this injury. Specifically, AMPS explains that the jury could have found that AMPS was originally worth $26.9 million and lost everything. The $26.9 million value was derived from Hancock's testimony that AMPS was worth $26.9 million in June 1996, based in part on projections. AMPS adds the $26.9 million damage model to AMPS's $3.1 million in losses between January 1997 and July 1998, to reach a total of $30 million. AMPS then divided the $30 million by the six defendants found to have harmed AMPS by breaching fiduciary duties. In other words, AMPS argues that the jury could have apportioned the total $30 million loss among the six defendants, for a total of $5 million each.

```
 $ 26,900,000 (Hancock's valuation of AMPS)
+ 3,100,000 (losses between January 1997 & July 1998)
= 30,000,000 (AMPS's total loss)

 $ 30,000,000 (AMPS's total loss)
/ 6 (number of defendants)
= 5,000,000 (jury award)
```

It is important to note that AMPS bases its calculation on the following six defendants: (1) Swank; (2) McCoy; (3) Sussman; (4) Chudnoff; (5) Gardere Wynne; and (6) David Jungman. Swank, McCoy, Sussman, and Chudnoff were listed in the jury question for breach of fiduciary duty damages. Gardere Wynne and Jungman were not. Sverdlin had sued Gardere Wynne and Jungman for malpractice.

---

**8.** In its reply brief on appeal, AMPS asks this Court for an opportunity to amend its brief under Tex.R.App. P. 38.9. We decline to do so.

The jury awarded Sverdlin nearly $60 million in actual and exemplary damages on those claims, which were later settled for a confidential amount.

During the December 29, 1998 hearing on entry of judgment, AMPS's counsel, Mr. Cunningham, explained the calculations as follows:

Now, the best I can do—and these lawyers are representing these individual parties will be much more articulate than I am in trying to say what their objections are to the total of $20 million to be awarded to AMPS derivatively; but the substance of what they are saying is they can't figure out how they come up with $5 million; but I can figure it out judge.

And that is that this corporation, the evidence is clear, was worth at least $27 million . . . . the expert's testimony was $26.9 million. . . .

Now, what they say is well between $20 million and of course before the settlement with Gardere & Wynne, 10 million more, that will be $30 million. That will be more than 27 point—$26.9 million.

. . . [T]here is a million six that was lost in 1997 plus another million dollars through six months of 1998; and if they are losing five hundred thousand dollars a month and you give another five hundred thousand dollars which just coincidentally the receiver's papers that he just filed for the third quarter reflect almost exactly that, a loss of a million four hundred and ninety, ninety-three or ninety-four some odd thousand dollars for the year, if you take that million five and add it to a million six and add it to 26.9, if you add one point six that they lost in 1997, plus a million five through three quarters of 1998 when this jury was hearing this evidence, you get to three million one. If you add three million one to 26.9, guess what you get, $30 million dollars. Twenty plus the ten caused by Gardere & Wynne.

. . . [T]hey are going to say, "Well, wait a minute. How did they get to $5 million?"

Well, if you take 30, if you know that's what the company lost; and we know that because that was the minimum loss based on the testimony . . . . its clear to me that the jury just said we know they have lost at least $30 million. If we divide it by 6, that's the most rational way to do it.[9]

AMPS divided the *$30* million losses by *six* defendants. This calculation is flawed because the jury assessed a total of *$20* million in damages against *four* defendants. Specifically, in Question Number 17, the jury assessed $5 million each in breach of fiduciary duty damages against the following *four* defendants: Swank, McCoy, Sussman, and Chudnoff. The jury did not assess a damage award for breach of fiduciary against Gardere Wynne, Jungman, LDE, or LDNGH. In Question Number 21, the jury assessed $10 million, or $5 million each to Gardere Wynne and Jungman for negligence-not for breach of

---

**9.** Later in the hearing, the trial court expressed its confusion as follows:

[Cunningham]: The facts are that AMPS was worth $27 million at a minimum. And the jury went through and divided up the amount of damages. . . . Remember when we got to the picture of damages that caused the corporation to lose everything, and that's a fact. It's uncontested in this record. It's insolvent, and it is in three or four million dollars of debt. . . . [The jury] really apportioned [the damages] amongst the officers and directors in the total of twenty million; but by letting Mr. McCoy out, we lost that $5 million; but that doesn't mean that the corporation didn't sustain more than $5 million in damages.

[The Court]: That kind of makes no sense, doesn't it?

fiduciary duty. Nowhere in the charge did the jury assess an additional $10 million for breach of fiduciary duty to Gardere Wynne and Jungman. As set forth above during the hearing, Mr. Cunningham stated, "$20 million and of course before the settlement with Gardere & Wynne, 10 million more, that will be $30 million." We cannot consider the settlement amount and find no evidence of "$10 million more" by Gardere Wynne. Thus, we hold that there is no evidence in the record to support AMPS's calculation.

■ We recognize that the jury has discretion to award damages within the range of evidence presented at trial, so long as a rational basis exists for the jury's calculation. *Mayberry v. Texas Dept. of Agric.*, 948 S.W.2d 312, 317 (Tex.App.-Austin 1997, writ denied). Through Hancock, AMPS presented a specific damage model and posited a precise (albeit flawed) calculation based on $30 million divided by 6 defendants to reach $5 million each. Therefore, this case is distinguishable from other types of cases in which the jury was presented with a range of potentially appropriate awards. *See id.*

Instead, this case is more akin to *First State Bank v. Keilman,* in which both parties provided a "relatively precise method" for calculating unauthorized interest. 851 S.W.2d 914, 931 (Tex.App.-Austin 1993, writ denied). In *Keilman,* the jury's $360 award fell in between the plaintiff's $7,161.44 figure and the defendant's $0 figure. *Id.* Although the award was within the range, the court explained that "a jury may not 'pull figures out of a hat'; a rational basis for the jury's calculation must exist." *Id.* at 930 (quoting *Neiman–Marcus Group, Inc. v. Dworkin,* 919 F.2d 368, 372 (5th Cir.1990)). The court concluded that the jury's finding of $360 was inexplicable in light of the evidence presented at trial and that there was no rational basis for the calculation. *Id.* at 931.

A jury may not "arbitrarily assess an amount neither authorized nor supported by the evidence presented at trial." *Id.* at 930. Because it appeared that the jury pulled its award "out of a hat," the court held that the evidence was insufficient. *Id.* at 931.

After a thorough review of the record, we conclude that there is no evidence in the record to support a finding that each of these defendants specifically caused $5 million in damages for their alleged breaches of fiduciary duty. We therefore hold that the evidence is legally insufficient to support the jury's $5 million awards each against Swank, Sussman, and Chudnoff for breach of fiduciary duty.

We reverse the judgment of the trial court with regard to the damage awards for breach of fiduciary duty. Because there is no evidence to support the damage awards for breach of fiduciary duty, we likewise reverse the judgment with regard to exemplary damages for breach of fiduciary duty and conspiracy to breach fiduciary duty. We render judgment that AMPS take nothing on its breach of fiduciary duty claims.

### Tortious Interference

■ Appellants contend that the evidence is legally and factually insufficient to support the jury's finding that they tortiously interfered with Sverdlin's employment agreement with AMPS.

#### *The Jury Question*

The issue of tortious interference was set forth in jury question 42 as follows:

### QUESTION NO. 42

Did any of the following individuals or entities intentionally interfere with Anatoly Sverdlin's Employment Agreement with [AMPS] without legal justification?

Answer "yes" or "no" as to each of the following.

| | YES | NO |
|---|---|---|
| a) Mark Swank | ✓ | |
| b) Jim McCoy | ✓ | |
| c) Marvin Chudnoff | ✓ | |
| d) Jeffrey Sussman | ✓ | |
| e) LDNGH | ✓ | |
| f) LDE | ✓ | |

You are instructed that interference is intentional if committed with the desire to interfere with the contract or with the belief that interference is substantially certain to result.

You are further instructed that legal justification means a good faith belief that he/she/it had a right to interfere with the contract.

### The Law

 A party to a contract has a cause of action for tortious interference against any third person who wrongly induces another contracting party to breach the contract. *Holloway v. Skinner,* 898 S.W.2d 793, 794–95 (Tex.1995). The elements of tortious interference with a contract are: (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) interference that proximately caused damage; and (4) actual damage or loss. *Powell Indus., Inc. v. Allen,* 985 S.W.2d 455, 456 (Tex.1998).

 In most cases, the alleged tortfeasor is a stranger to the contract. *Holloway,* 898 S.W.2d at 795. However, the inducing and the breaching party may be one and the same. *Id.* When the alleged tortfeasor is also a corporate agent, the second element of this cause of action, the act of interference, is of particular importance. To establish a prima facie case under such circumstances, the alleged act of interference must be performed in furtherance of the tortfeasor's own personal interests. *Id.* at 796. This requirement is necessary to preserve the general rule that a party cannot tortiously interfere with its own contract. *Id.* To meet this burden in a case of this nature, the plaintiff must show that the tortfeasor acted in a fashion so contrary to the corporation's best interests that his actions could have been motivated *only* by personal interests. *Id.* (emphasis added). A corporate agent's "mixed motives" to benefit himself as well as the corporation are insufficient to establish liability. *Id.* at 796 (citation omitted). When determining whether an agent acted against the corporation's interests, we consider the corporation's evaluation of the agent's actions. *Powell Indus., Inc.,* 985 S.W.2d at 457. "A corporation is a better judge of its own best interests than a jury or court." *Id.*

### Waiver

 Sverdlin contends that appellants waived this challenge by failing to object to the form of the question submitted. We disagree. An objection to the charge was not necessary here because we are reviewing the sufficiency of the evidence to support the finding based on the definition and instructions submitted to the jury in the charge as written. *See Larson v. Cook Consultants, Inc.,* 690 S.W.2d 567, 568 (Tex.1985).

### No Evidence of Tortious Interference

Appellants contend that *Powell Indus., Inc. v. Allen* is directly on point. 985 S.W.2d at 457. In *Powell,* the company's CEO asked Allen, another executive, to have the company pay $3,000 for the CEO's personal accounting services. *Id.* at 456. Allen told the CEO that payment would be illegal. *Id.* Shortly thereafter, Allen was fired, and he sued the CEO for tortious interference with his employment contract. *Id.* The court held, "While [the CEO] may have benefitted by firing Allen, the mere existence of a personal stake in the outcome is insufficient to show that the defendant committed an act of willful or intentional interference." *Id.* at 457. Allen did not adduce evidence that the CEO

acted "only in his own interest and against the company's interest"; therefore, the tortious interference claim failed.

Similarly, in this case, it is insufficient for Sverdlin to show that appellants committed an act of willful or intentional interference. There were reports that Sverdlin had become disruptive, abusive, and a negative force in the company. As in *Powell,* evidence of a corporate officer's mixed motives—to benefit both himself and the corporation—is insufficient to prove tortious interference. *Id.* Sverdlin did not adduce evidence that appellants acted only in their own interests and against AMPS's interests. The record shows that AMPS's board authorized Swank to fire Sverdlin. Given the board's approval of firing Sverdlin, and Swank's action in firing Sverdlin based on such approval, we cannot conclude that Swank, Chudnoff, Sussman, or McCoy acted in a manner so contrary to AMPS's interests that they could have been motivated only by their personal interests. Sverdlin argues that his termination was not in AMPS's best interests; however, even if true, this complaint is not conclusive evidence of tortious interference. *See id.* ("A principal's complaint about its agent's actions is not conclusive of whether the agent acted against the principal's best interests.")

Moreover, even after Sverdlin was fired, he did not have the authority to fire the board members, despite his threats to do so. Under the loan agreement, Sverdlin had agreed to vote all shares of AMPS to elect at least two individuals designated by the lender. Accordingly, appellants' job security could not have been a motivation to fire Sverdlin. Because appellants' stock options in AMPS were already granted to them, those rights would not have changed by firing Sverdlin. Finally, appellants had a financial interest in AMPS, including stock, stock options, and loans. Thus, they had financial reasons to act in the best interest of AMPS.

LDE Associates was represented by agents Sussman and Chudnoff who were on the board at AMPS and acted in a manner consistent with AMPS's interests and, therefore, cannot be liable for tortious interference. Likewise, LDNGH cannot be liable for tortious interference based on such agent's or LDE Associate's liability.

After reviewing the record in this case, we hold that there is no evidence to prove that appellants committed an act that was so contrary to the corporation's best interests that it could have been motivated only by the pursuit of personal interests. Therefore, we hold that there is no evidence of tortious interference. We reverse the judgment with regard to tortious interference and render judgment that Sverdlin take nothing on his tortious interference claim.

Accordingly, we need not address the affirmative defense of legal justification. Nor do we reach appellants' remaining argument that the punitive damages for tortious interference are in excess of the statutory limit.

### Fraud Damages

██ We address whether there is evidence of damages for fraud against Sverdlin in connection with the transaction involving his patents.

#### *The Jury Question*

The issue of fraud damages was set forth in jury question 35 as follows:

### QUESTION NO. 35

What sum of money, if any, if paid now in cash would fairly and reasonably compensate Anatoly Sverdlin for his damages, if any, that were proximately caused by such fraud?

Answer in dollars and cents, if any, as to each of the following.

| | | |
|---|---|---|
| a) Mark Swank | $26.5mm |
| b) Jim McCoy | $26.5mm |
| c) Marvin Chudnoff | $26.5mm |
| d) [LDNGH] | $26.5mm |
| e) [LDE] | $26.5mm |

Consider the following element of damages, if any, and none other:

*The difference, if any, between the value of the patents as received and the value they would have had if they had been as represented.*

(Emphasis added.)

### Waiver

 Sverdlin contends that appellants waived this challenge by failing to object to the form of the question submitted. Again, we disagree. An objection to the charge was not necessary here because we are reviewing the sufficiency of the evidence to support the finding based on the definition and instructions submitted to the jury in the charge as written. *See Larson,* 690 S.W.2d at 568. We are not authorized to evaluate the sufficiency of the evidence under calculations different from those the jury were instructed to employ. *See id.*

### No Evidence of Fraud Damages

There is no evidence to support an award of damages for fraud based on the measure of damages submitted to the jury. Sverdlin's fraud claim was not based on misrepresentations regarding the patents, and the patents were to be *conveyed* by Sverdlin, not *received* by him. Sverdlin did not purchase the patents, and the value of the patents was never misrepresented to him. Thus, there is no evidence of the value of the patents as received, the value of the patents as represented, or the difference, if any, between those values. The only evidence of the value of the patents was the value of the FCIS business, $25.4 million, which Hancock, Sverdlin's and

AMPS's expert on damages, also identified as the value of the patents. There is no evidence to support a damage award for fraud under the theory submitted to the jury.

We reverse the judgment of the trial court for fraud damages in connection with Sverdlin's patents and render that Sverdlin take nothing on his fraud claim. Therefore, we do not reach the issue of fraud liability.

### Negligent Misrepresentation

 Sverdlin asserts a conditional cross-appeal asserting that the trial court erred in disregarding the jury's affirmative finding of negligent misrepresentation.

 To prevail on a negligent misrepresentation claim, the plaintiff must demonstrate: (1) the representation was made by a defendant in the course of his business, or in a transaction in which he had a pecuniary interest; (2) the defendant supplied false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffered pecuniary loss by justifiably relying on the representation. *Federal Land Bank Ass'n. v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991). To establish negligent misrepresentation, the plaintiff must also prove that the defendant misrepresented an "existing" fact in the course of the defendant's business rather than a promise of future conduct. *See Miksch v. Exxon Corp.,* 979 S.W.2d 700, 706 (Tex.App.-Houston [14th Dist.] 1998, pet. denied).

The alleged oral representations, which Sverdlin asserts constitute negligent misrepresentation, are promises of future conduct, and are not promises of existing fact. *See id.* (holding that alleged oral promise not to terminate Miksch was not a misrepresentation of an existing fact but was a

promise to refrain from taking an action in the future). For example, the alleged oral promises not to fire Sverdlin, not to take control of AMPS, and not to exercise their stock options are promises of future conduct, not existing fact. As such, Sverdlin is not entitled to recover for negligent misrepresentation.

 In determining whether Sverdlin met the justifiable reliance element, we must consider the nature of the relationship and the contract. Reliance on representations made in a business or commercial transaction is not justified when the representation takes place in an adversarial context. *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 794 (Tex.1999). Chudnoff, LDNGH, and LDE were adversaries of appellees in negotiating the June and September 1996 contracts. Thus, representations made by Chudnoff, LDNGH, and LDE during the contract negotiations do not justify reliance by Sverdlin and AMPS. Furthermore, in examining the contracts, the alleged misrepresentations by appellants are contrary to the terms of the contracts. To determine the terms of the contract, Sverdlin could have read the contracts. The fact that Sverdlin failed to read the contracts and simply chose to sign them does not amount to a ground of recovery for negligent misrepresentation.

We hold that the trial court did not err in disregarding the jury's finding of negligent misrepresentation.

### Remaining Issues

The parties have also raised issues about disregarding the corporate fiction, reliability of expert testimony, multiple recovery, punitive damages (statutory cap and constitutionality), remittitur, settlement credit, attorneys' fees, perjury, and jury argument. Based on our disposition of the issues set forth above, we need not address the remaining issues and decline to do so.

### Conclusion

For the above reasons, we reverse the judgment of the trial court and render judgment that Sverdlin and AMPS take nothing.