Opinion issued August 27, 2015



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-14-00458-CV

————————————

**JAGDISH TUMMALA, M.D., EVEREST INPATIENT PHYSICIANS, PLLC, SHAH & DICHOSO, PLLC, PRAGNESH R. SHAH, M.D., P.A., AND DARYL D. DICHOSO, M.D., P.A., Appellants/Cross-Appellees**

**V.**

**TOTAL INPATIENT SERVICES, P.A., Appellee/Cross-Appellant**

---

**On Appeal from the 270th District Court
Harris County, Texas
Trial Court Case No. 2012-72321**

---

## MEMORANDUM OPINION

Appellants/cross-appellees, Jagdish Tummala, M.D., Everest Inpatient

Physicians, PLLC ("Everest"), Shah & Dichoso, PLLC, Pragnesh R. Shah, M.D.,

P.A., and Daryl Dichoso, M.D., P.A ("Shah") (collectively, "appellants"),

challenge the trial court's judgment, entered after a trial to the court, in favor of appellee/cross-appellant, Total Inpatient Services, P.A. ("TIPS"), in TIPS's suit against appellants for breach of contract and tortious interference with a contract. In four issues, appellants contend that the trial court erred in concluding that Dr. Tummala breached a covenant not to compete in his employment agreement with TIPS, concluding that Everest and Shah tortiously interfered with TIPS's contract with Tummala, and awarding TIPS damages. TIPS, in its sole cross-point, contends that the trial court erred in denying it attorney's fees.

We affirm in part and reverse and render in part.

## Background

In its third amended petition, TIPS alleged that it is a hospitalist[1] group that enters into employment agreements with physicians and service contracts with hospitals in the Houston area to provide teams of physicians for inpatient care. In the summer of 2011, TIPS and Dr. Tummala entered into an employment agreement (the "agreement"), which contains a "non-competition covenant" that prohibited him, for a one-year period after the termination of his employment with TIPS (the "restriction period"), from providing hospitalist or inpatient services at any of the hospitals listed in TIPS's service area.

---

[1] TIPS explained that a "hospitalist" is a "physician[] who specialize[s] in providing in-hospital patient care."

On September 26, 2012, Dr. Tummala terminated his employment with TIPS. He then started working for Everest and Shah,[2] providing inpatient care at two of the hospitals in TIPS's service area. TIPS asserted that, in so doing, Tummala had breached the non-competition covenant. TIPS further asserted that Everest and Shah had tortiously interfered with its employment contract with Tummala by inducing him to "breach his [a]greement with TIPS notwithstanding their knowledge of that [a]greement[,] including the [non-competition covenant]."

TIPS sought a declaration that the non-competition covenant was "enforceable and effective," along with an "equitable exten[sion]" of the non-competition covenant "for the period in which [Dr. Tummala] was in breach," and damages. Appellants answered, generally denying TIPS's allegations and asserting various affirmative defenses.

At trial, Dr. Tummala testified that after he and TIPS had executed an initial employment agreement, he requested an advance of his signing bonus and relocation assistance. TIPS agreed to provide the advance on the condition that Tummala execute a modified employment agreement, the agreement at issue, which contains a "restrictive covenant that precluded [him] from working in hospitals that TIPS serves" for a one-year period after termination of his

---

[2] Everest and Shah are "closely related entities" that "jointly function as direct competitors to TIPS [in] performing the same services in some of the same hospitals."

3

employment. Tummala agreed to the non-competition covenant and signed the agreement. He explained that although the agreement shows an effective date of September 1, 2011, he did not actually begin working for TIPS until September 27, 2011. On May 17, 2012, he sent TIPS notice that he was terminating the agreement and his last date of employment would be September 26, 2012. And he continued working for TIPS until then.

On September 28, 2012, TIPS sent to Dr. Tummala a letter, noting that if he "wished to engage in competition within [its] . . . service area," he could "do so" only by paying TIPS a $100,000 "buy out" as set out in their agreement. Tummala explained that although he began working for Everest in November 2012 at Memorial Hermann Southwest Hospital and Memorial Hermann Sugar Land Hospital (collectively, "Memorial Hermann"), both of which are included in TIPS's service area, TIPS was not actually serving these hospitals during the restriction period.

Dr. Mark Murray, executive vice-president of TIPS, testified that TIPS was credentialed at Memorial Hermann through 2010, and it was "re-credentialed" in 2013. TIPS was not credentialed at the two hospitals during 2011 and 2012, and its physicians could not have cared for patients at the hospitals at the time that Dr. Tummala terminated their agreement. However, Murray explained that Tummala, while working for TIPS, had attended meetings at which TIPS had discussed its

4

plans to become re-credentialed at the two hospitals. He also noted that Tummala, during his employment with TIPS, had been given confidential information, namely, TIPS's "Procedures" manual and lists of its physicians. In August 2012, about a month before Tummala's departure, TIPS received a request from Memorial Hermann, seeking credentialing information about Tummala. Although TIPS provided the requested information, it cautioned Tummala about violating the non-competition covenant. And TIPS contacted Everest, providing it with a copy of the agreement. Everest responded that the agreement was not enforceable.

Dr. Pragnesh Shah, an owner of Everest, testified that he has practiced at Memorial Hermann Sugar Land Hospital since 2008 and Memorial Hermann Southwest Hospital since 2011. During the time from 2011 to 2012, he treated approximately 100 patients per month at each facility. Shah recalled speaking with Dr. Tummala in June 2012 about coming to work for Everest; however, Everest did not employ physicians at that time. Although Tummala told Shah about the non-competition covenant, he "made it very clear that the only hospitals he was not allowed to work at, based on his conversation with Dr. Murray, were the service area hospitals," which included "Methodist Sugar Land Hospital, St. Luke's Sugar Land Hospital, Kindred Sugar Land Hospital, and Oak Bend." Shah explained that he did not see the agreement until September 2012, when TIPS sent a copy of it to Everest.

The trial court rendered judgment for TIPS on its claims against appellants, awarding it $100,000 against appellants, jointly and severally. However, it denied TIPS's request for attorney's fees. The trial court also issued findings of fact and conclusions of law.

## Non-competition Covenant

In their first issue, appellants argue that the trial court, "as a matter of law," erred in concluding that Dr. Tummala "breached the non-compete provision" because "it did not apply" to Tummala after the termination of his employment with TIPS. Appellants assert that, "[w]ithout an effective non-compete provision, there can be no judgment" that Tummala breached the agreement.

In construing a written contract, a court "must ascertain and give effect to the true intentions of the parties as expressed in the writing itself." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). We examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Id.* We begin our analysis with the contract's express language. *Id.* And we analyze the provisions of a contract "with reference to the whole agreement." *Frost Nat'l Bank v. L&F Dists., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005); *see also Seagull Energy E&P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006) ("No single provision taken alone will be given controlling effect; rather, all the

6

provisions must be considered with reference to the whole instrument."). Contract terms will be given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). "We construe contracts 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and 'will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.'" *Frost Nat'l Bank*, 165 S.W.3d at 312 (quoting *Reilly v. Rangers Mgmt., Inc*., 727 S.W.2d 527, 530 (Tex. 1987)).

If, after applying the pertinent contract construction rules, the contract can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and we will construe the contract as a matter of law. *Id.* If a contract "is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). However, a contract is not ambiguous merely because the parties disagree on its meaning. *Seagull Energy E & P, Inc*., 207 S.W.3d at 345. Only if a contract is ambiguous may we consider the parties' interpretation and consider extraneous evidence to determine the true meaning of the contract. *Italian Cowboy Partners*, *Ltd*., 341 S.W .3d at 333–34.

Here, the agreement provides, in pertinent part, as follows:

**6.2 <u>Non-Compete</u>**.  In consideration for the access to the Confidential Information provided by [TIPS] and in order to enforce the Physician's Agreement regarding such Confidential Information, *Physician agrees that he/she shall not, during the term of this Agreement and for a period of one (1) year from the date this Agreement expires pursuant to Section 8.3 or is terminated by Physician pursuant to Section 8.6 (the "Restriction Period")*, without the prior written consent of [TIPS], except in the performance of duties for [TIPS] pursuant to this Agreement, directly or indirectly *within any Hospital in the Service Area or any other hospital in which the Physician practiced on behalf of [TIPS]*, in excess of 40 hours, within his last year of employment with [TIPS]:

> **6.2.1** *Provide services as a hospitalist physician to any entity that offers inpatient hospital and emergency department services*;

> . . . .

Further, Physician may buy out this non-compete covenant for a cash price of $100,000, which Physician agrees is a reasonable price.

(Emphasis added.)  Article eight, which governs termination, provides in pertinent

part:

**8.1 <u>Term</u>**.  This Agreement shall commence on September 1, 2011 (the "Effective Date"), or the first actual working day, and shall continue for an initial period of 12 months, subject to the provisions set forth below.

**8.2  <u>Introductory Period</u>**.  The first twelve (12) months of employment of Physician at [TIPS] constitutes the new hire introductory period (the "Introductory Period"). . . .  During the Introductory Period, and notwithstanding anything to the contrary contained herein, either party may terminate this Agreement at any time, effective upon one hundred twenty (120) days written notice of such termination, as determined by each party in the sole exercise of its discretion.  If this Agreement is terminated by Physician during the Introductory Period pursuant to this Section 8.12 [sic], Physician shall

promptly repay to [TIPS] any relocation reimbursement paid by [TIPS] to Physician. *During the Introductory Period, the termination provisions of this Section 8.1 [sic] shall supersede the provisions of Section 8.6.*

**8.3 End of Term**. Following expiration of the term set forth in Section 8.1, this Agreement will renew automatically from year to year, for successive terms of one year each, unless or until terminated or otherwise agreed upon in writing by Physician and [TIPS].

. . . .

**8.6 Termination Without Cause**. Each party shall have the right to terminate this Agreement without cause upon providing one hundred twenty (120) days written notice to the other prior to the date of termination. If Physician terminates this Agreement pursuant to this Section 8.6, [TIPS], in its sole discretion, may waive any or all of the one hundred twenty (120) day notice period and require the termination to be effective immediately, in which case [TIPS's] sole obligation to Physician shall be to continue to pay Physician's Base Compensation for any portion of the one hundred twenty (120) day period waived by [TIPS] or until Physician commences providing professional services elsewhere, whichever occurs earlier.

(Emphasis added.)

Exhibit B to the agreement provides that TIPS was to pay to Dr. Tummala a "$7,500 moving allowance during the first week of July, 2011" and a "sign-on bonus" the "first week of August." It notes that if Tummala was to leave "prior to the term" of the agreement, he would owe to TIPS a "pro-rated portion" of the moving allowance, bonus, and recruitment fees. Exhibit C provides that "[f]or purposes of Section 6.2," TIPS's "Service Area shall be defined by reference to the following hospitals: [List of hospitals, including Memorial Hermann Sugar Land and Memorial Hermann Southwest Hospital]."

9

In section 6.2 of the agreement, which contains the non-competition covenant, the parties agreed that Dr. Tummala would not, for a period of one year "from the date th[e] [a]greement expire[d] pursuant to Section 8.3" or he terminated his employment "pursuant to Section 8.6," provide hospitalist services within the TIPS service area. Section 8.3 provides for automatic renewal of the agreement "following" the expiration of the initial twelve-month introductory period, unless terminated. And section 8.6 provides that either party could terminate the agreement upon 120 days' written notice. However, section 8.2, which governed the first twelve months of Tummala's employment at TIPS, provides that the termination provisions therein "supersede the provisions of Section 8.6."

Section 8.2 further provides that the first twelve months of Dr. Tummala's employment at TIPS constituted the "introductory period," during which, "notwithstanding anything to the contrary" in the agreement, either party could terminate the agreement at any time, "effective upon one hundred twenty days written notice of such termination." Nothing in the non-competition covenant provides that it would apply upon Tummala's termination of the agreement within the section 8.2 introductory period. *See Dorsett*, 164 S.W.3d at 662 (noting contract terms given their plain, ordinary, and generally accepted meanings). That the parties did not intend for the non-competition covenant to apply during the

10

introductory period is further supported by the fact that the purpose of the introductory period, as provided in section 8.2, was for TIPS to evaluate the physician's "performance and potential for continued employment" and to "afford[]" the physician the "opportunity to evaluate whether his/her employment" by TIPS met "his/her expectations." This provisional aspect of the agreement contemplates that the parties might terminate their relationship early on. *See Frost Nat'l Bank*, 165 S.W.3d at 312 ("We construe contracts 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and 'will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.'" (citation omitted)).

More important, TIPS concedes that if Dr. Tummala "had left within the first year," then the "post-employment non-compete obligation would not have been triggered." Section 8.1 of the agreement provides for commencement of the agreement upon either the effective date or the physician's "first actual working day." It is undisputed that Tummala's "first actual working day" under the agreement was September 27, 2011. Thus, the section 8.2 introductory period expired twelve months later, on September 27, 2012. And it is undisputed that Tummala, after giving notice, ceased working for TIPS on September 26, 2012. Because Tummala did terminate his employment with TIPS within the first year, the post-employment non-competition covenant was not triggered.

11

TIPS asserts that although Dr. Tummala "could have taken advantage of [s]ection 8.2 if he had departed from TIPS" 120 days after his May 17, 2012 notice, or "between September 14, 2012 and September 25, 2012," "he in fact completed a full year at TIPS" because he departed on September 26, 2012. It argues, thus, that section 8.3 applies. Again, however, September 26, 2012 fell within the section 8.2 introductory period. Section 8.3, which applies "[f]ollowing" the expiration of the introductory period, does not apply. Further, section 8.3 provides that the agreement will "renew automatically . . . unless or until terminated." Because Tummala terminated the agreement, it did not renew.

Finally, TIPS, in support of its argument that the non-competition covenant applies, notes that Dr. Tummala testified that he "understood that he could not compete with TIPS by providing hospitalist services at any hospital served by TIPS in the Service Area for one year" after terminating his employment. However, only if a contract is ambiguous may we consider the parties' interpretation and extraneous evidence to determine the true meaning of the contract. *Italian Cowboy Partners*, *Ltd.*, 341 S.W .3d at 333–34. Here, the agreement is simply not ambiguous.

We conclude that because Dr. Tummala timely terminated his employment with TIPS during the introductory period of the agreement, he was not bound by

the non-competition covenant. Accordingly, we hold that the trial court erred in concluding that Tummala breached the agreement.

We sustain appellants' first issue.[3]

## Tortious Interference

In their third issue, appellants argue that the trial court erred in concluding that Everest and Shah had tortiously interfered with TIPS's employment contract with Dr. Tummala because he "did what he had a right to do: terminate his employment agreement after supplying the requisite notice." Appellants specifically challenge the trial court's conclusion of law number 6, in which it concluded that Everest and Shah had "tortiously interfered with TIPS's contract with Tummala."

We review a trial court's conclusions of law de novo. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). "A party to a contract has a cause of action for tortious interference against any third person who wrongly induces another contracting party to breach the contract." *Swank v. Sverdlin*, 121 S.W.3d 785, 799 (Tex. App.—Houston [1st Dist.] 2003, pet. denied); *see Holloway v. Skinner*, 898 S.W.2d 793, 794–95 (Tex. 1995). The elements of a

---

[3] Having sustained appellants' first issue, we need not address their second issue, in which they argue that to the extent that the non-competition covenant "applies" to Dr. Tummala, it is "unenforceable as a matter of law" because it was not supported by "new consideration" and constituted an unreasonable restraint.

cause of action for tortious interference with a contract are: "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damage or loss." *Prudential Ins. Co. of Am. v. Fin. Review Serv., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *see Holloway*, 898 S.W.2d at 795–96; *Funes v. Villatoro*, 352 S.W.3d 200, 213 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). To prevail on a tortious-interference claim, the plaintiff must present evidence that the defendants interfered with a specific contract. *Funes*, 352 S.W.3d at 213. To establish the element of an act of willful and intentional interference, a plaintiff must produce some evidence that a defendant was more than a willing participant and knowingly induced one of the contracting parties to breach its obligations under the contract. *Id.* To do so, a plaintiff must present evidence that *an obligatory provision* of the contract was breached. *Id.*

TIPS asserts that trial court did not err in concluding that Everest and Shah had tortiously interfered with its employment agreement with Dr. Tummala because the evidence establishes that "[a]fter Tummala gave notice to TIPS in May of 2012, he began discussions with [Everest and Shah]," and he "made them aware of his *non-compete*." (Emphasis added.) Although Everest and Shah "were warned *not to compete* at these two hospitals," they "assisted Tummala with obtaining credentials at the two hospitals" at issue, "chose to claim the *non-compete was*

14

*invalid*," and "continued to send Tummala to the hospitals in violation of the non-compete." (Emphasis added.) TIPS asserts that Everest and Shah had "no legal right to induce [a] breach of the *non-compete*."[4] (Emphasis added.)

Having concluded above in the first issue that Dr. Tummala was not bound by the non-competition covenant in his agreement with TIPS, we further conclude that TIPS's claim for tortious interference, which is predicated on Tummala being bound by the non-competition covenant, cannot legally stand. Accordingly, we hold that the trial court erred in concluding that Everest and Shah "tortiously interfered with TIPS's contract with Tummala."

We sustain appellants' third issue.

## Damages

In their fourth issue, appellants argue that the trial court erred in awarding TIPS $100,000 in actual damages based on the non-competition covenant "buyout price" because, again, Dr. Tummala was not bound by the non-competition covenant.

---

[4] TIPS explains that it "does *not* contend" that Dr. Tummala "breached by terminating" the agreement and "does *not* contend Tummala breached the [a]greement by going to work with Everest." And it "does *not* believe that [Everest and Shah's] now professed desire to work with Tummala was an act of tortious interference." Rather, TIPS's tortious-interference claim is based on the fact that Everest and Shah "chose to claim that the non-compete was invalid and continued to send Tummala to the hospitals in violation of the non-compete."

15

A trial court may award an employer damages for a breach by an employee of a covenant not to compete. *See* TEX. BUS. & COM. CODE ANN. § 15.51(a) (Vernon 2011). Having concluded above, however, that Dr. Tummala was not bound by the non-competition covenant, we further hold that the trial court erred in awarding TIPS damages.

We sustain appellants' fourth issue.

### Attorney's Fees

In their sole cross-point, TIPS argues that the trial court erred in not awarding it attorney's fees because it was the prevailing party on its breach-of-contract claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (Vernon 2015).

"A person may recover reasonable attorney's fees . . . in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." *Id.* To recover fees under the statute, a litigant must (1) prevail on a breach-of-contract claim and (2) recover damages. *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 666 (Tex. 2009).

Having held above that the trial court erred in concluding that Dr. Tummala breached his employment agreement with TIPS, TIPS has not prevailed on its breach-of-contract claim. Thus, it is not entitled to recover its attorney's fees. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001. Accordingly, we hold that the trial court did not err in not awarding TIPS its attorney's fees.

16

We overrule TIPS's cross-point.

## Conclusion

We reverse the portion of the trial court's judgment as to liability and damages, and render judgment that TIPS take nothing on its claims against appellants. We affirm the portion of the trial court's judgment denying TIPS attorney's fees.

Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Huddle.

Huddle, J., concurring.