

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---

No. 02-20-00371-CV

---

ASTA PARTNERS, LLC AND ASTA GOLD 1, LLC, Appellants

V.

VELUMANI PALANISWAMY, Appellee

---

On Appeal from the 462nd District Court
Denton County, Texas
Trial Court No. 17-1244-431

---

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

This is a case in which a founding co-manager—Appellee Velumani Palaniswamy (Velu)—siphoned funds from Appellants Asta Partners, LLC and Asta Gold 1, LLC from 2009 to 2015. Appellants then sued Velu,[1] alleging claims for theft, conversion, breach of contract, breach of fiduciary duty, fraud, and malice and seeking loss-of-use damages, prejudgment interest, and attorneys' fees. The claims were resolved piecemeal via a summary judgment, a jury trial, and a bench trial. The trial court granted summary judgment for Appellants on their claims for theft, conversion, and breach of contract. The damages related to those claims were tried to a jury, as well as the claims for breach of fiduciary duty, fraud, and malice. After both sides rested in the jury trial, the trial court granted Appellants' motion for a directed verdict on their breach-of-fiduciary-duty claim; the jury found no fraud or malice and, following the agreed-to mitigation-of-damages instruction that was included in the jury charge, awarded Appellants $130,100 as damages for theft, conversion, and breach of contract. The trial court held a bench trial on prejudgment interest, loss-of-use damages, and attorneys' fees and awarded Appellants $52,040 in attorneys' fees

---

[1]Appellants initially sued Velu; Velu's wife, Selvi Palaniswamy; and Kannan Kalimuthu but nonsuited Kalimuthu six months later. Appellants amended their petition to sue only Velu and Selvi, but prior to the start of the jury trial, Appellants nonsuited their claims against Selvi in exchange for a stipulation that "any amounts withdrawn from any Asta account by [Velu], per checks written to Selvi [were] to be treated just as if he [had written] the checks himself."

for the trial proceedings and $0 for prejudgment interest. The trial court's final judgment included only the jury's damages award, the award of trial attorneys' fees, and a statement that no prejudgment interest was awarded; thus, the judgment omitted any reference to the claim for loss-of-use damages and to the directed verdict on the breach-of-fiduciary-duty claim. Appellants filed a motion to correct the judgment so that it would reference the directed verdict on the breach-of-fiduciary-duty claim. Within that motion, they also sought a judgment notwithstanding the verdict (JNOV) on the damages award, asking the trial court to disregard the jury's finding that Appellants could have avoided $102,563.73 of the damages for theft, conversion, and breach of contract by exercising reasonable care and claiming that they conclusively proved $232,663.73 in damages. But the trial court denied the motion.

On appeal, Appellants raise five issues contending that the trial court erred by denying their JNOV and by not awarding the full amount of damages that they claim were conclusively proven; that the trial court abused its discretion by failing to award the full amount of proven attorneys' fees and any appellate attorneys' fees, prejudgment interest, and loss-of-use damages; and that the trial court abused its discretion by failing to amend the judgment to include the directed verdict on the breach-of-fiduciary-duty claim. Based on the analyses below for Appellants' first, second, fourth, and fifth issues, we hold that the trial court did not err or abuse its discretion because

3

- the jury charge specifically allowed the jury to reduce the damages by the amount that the jury found Appellants could have avoided by the exercise of reasonable care, regardless of the discovery date of the breach; thus, sufficient evidence supported the jury's answer to the mitigation instruction;

- the general principles of equity governing prejudgment interest did not warrant an award of prejudgment interest under the facts here;

- Appellants failed to conclusively establish that they had incurred loss-of-use damages based on their pleadings; and

- the ruling on the directed verdict merged into the trial court's judgment.

But because the trial court's findings of fact reflect that the trial court failed to follow the two-step lodestar method for calculating trial attorneys' fees and because the trial court failed to award any appellate attorneys' fees despite that Appellants were entitled to an award of appellate attorneys' fees, we sustain Appellants' third issue and reverse and remand solely for a redetermination of trial attorneys' fees and for the trial court to determine the amount of appellate attorneys' fees.

## II. Background

Asta Partners, LLC and Asta Gold 1, LLC were formed in 2008[2] by an initial group of twenty members—consisting of family, friends, and relatives of Velu and Selvi and Ramasamy Eswaran (Samy) and his wife—who pooled together over $400,000 and purchased a building the following year. The members agreed to have a property-management company manage the building's day-to-day operations and selected Vintage Realty to serve as the property manager. Vintage Realty held the checkbook for Asta Gold.

Velu and Samy served as Appellants' initial co-managers, but Velu served as the point person. Although Samy was authorized to sign checks on Appellants' account at PointBank and had equal online access to the account, Velu held the only checkbook for Asta Partners and was the only one with access to the QuickBooks® for Asta Partners. Vintage sent profit-and-loss reports only to Velu. Dale Downing served as the CPA who prepared Appellants' tax returns, but he did not serve as a bookkeeper; instead, Velu was in charge of the bookkeeping and supplied Downing with the financial statements that he prepared on QuickBooks.®

---

[2]Each LLC had its own Company Agreement. The Company Agreements contained virtually the same provisions, except that the Company Agreement for Asta Partners contains Sections 6.04 through 6.10, dealing with managers; Asta Gold's Company Agreement omits those sections. The parties focus on the Asta Partners' Company Agreement. We therefore also reference singularly to that Company Agreement.

According to the Company Agreements, the members were entitled to annual financial statements. In 2009, Samy and other members started asking Velu for the financial statements. Velu gave excuses for why he could not provide the financials. Samy continued to ask Velu quarterly for financial statements for the following six years but did not take any additional steps despite receiving no financial statements from Velu. Samy became concerned only when PointBank called him in June 2015 and told him that the prior year's taxes had not been paid.

The following month, the members received an email from Velu in which he stated that he had loaned money to himself from Appellants and that he would pay it back with nominal interest. Velu did not state the amount that he had taken.

In August 2015, Velu turned over Appellants' financial statements to Samy.[3] The amount calculated from QuickBooks® that Velu had turned over showed that he had taken $155,000, but a calculation that was made at a later date using Velu's personal bank statements showed that he had taken $232,000.

After Velu failed to repay the money, Appellants filed the underlying suit alleging claims for theft, conversion, breach of contract, breach of fiduciary duty, fraud, and malice and seeking actual damages, loss-of-use damages, prejudgment interest, and attorneys' fees. As noted above, the trial court granted summary

[3]After receiving the financial information from Velu, Samy and fellow member Maha Sengottiyan went to PointBank and removed Velu from the account and added Sengottiyan's name to the account; Sengottiyan also replaced Velu as a co-manager.

6

judgment in favor of Appellants on their claims for theft, conversion, and breach of contract.

During the jury trial on the damages for the theft, conversion, and breach-of-contract claims, Velu agreed that from 2009 to 2015, he had taken over $412,000 out of Appellants' accounts by check and transferred it to his account, listing the transactions on the financial statements as "loan to others."[4] From the $412,000, he made annual tax payments and a $25,000 payment back to Asta Partners. He admitted that he had not paid back $232,663.73—an amount that Appellants' attorney said reflected a deduction for the $25,000 payment.

Velu agreed that he should not have made the loans to himself because they were prohibited by the Company Agreement. Velu testified that Samy did not know about the loans and that July 2015 was the first time that Velu had told the members that he had taken money. Even Velu's wife, who was a member, did not know that her husband had stolen money from Appellants.[5]

Samy testified that he did not know prior to Velu's July 2015 email that Velu had taken money from Appellants. Samy said that he had asked Velu quarterly for the financial statements because he wanted to know the amount they were saving and the

---

[4]However, the 2011 tax return reflected a loan to Velu.

[5]Selvi testified that Velu had a job traveling to India and was not paid for two years of work and that she believes he took the money because he was ashamed that he could not provide for his family. Selvi did not believe that Velu had intended to hurt anyone.

return on investment. Samy agreed that he could have gone to the bank during the 2009 to June 2015 time frame and looked at the bank statements, but the withdrawals would not have been identified as loans to Velu or "loans to others."[6] Samy admitted that the tax returns did note a loan to members. Samy knew who served as Appellants' accountant, but he never asked Downing to provide a copy of the tax returns from 2009 to 2015. Samy also admitted that he had met the account manager at Vintage and could have called her and asked to receive the property-management reports. Samy testified that he should have looked at the tax returns, the financials, and Vintage's reports from 2009 to 2015 but that he had trusted Velu 100%. Samy agreed that under the Company Agreement, it was his job as a co-manager to look at those documents.

During cross-examination, defense counsel questioned Samy about how long he should have waited for financial information from Velu before seeking to obtain the information from other sources:

> Q. How many years do you think somebody has to deny you basic financial information before you are failing to use ordinary care to call Vintage, who knew you were a manager and you could get the information from, Dale Downing, who knew you were the manager and you could get information from, or PointBank, who knew you were the manager and you could get information from?

---

[6]However, Sengottiyan, who replaced Velu as co-manager, agreed at trial that other than two cash withdrawals that Velu had made—one in 2009 and one in 2014—totaling $6,000, the rest of the funds taken could have been discovered by looking at the bank statements. Velu withdrew the rest of the money via checks written to himself.

How many years do you have to not get information before you're not using ordinary care as a manager to get the information?

A. I never suspected him, so that's why I didn't make an attempt. But because the other members were asking for financials, my wife was asking for the financial details, so I was insisting we need to do that because I'm also a co[-]manager. I was repetitively asking.

Q. And so as the co[-]manager, if Velu's not -- in other words, if Velu's not responsive to the members, there's someone else who can be. It was you, right?

A. Correct. Correct.

. . . .

Q. And at any point in time, you could have gone to PointBank and said, I want to get all the statements that you have for this account, I'm a signatory, and they would have given it to you, correct?

A. That's correct.

Q. And you didn't do that in 2009, correct?

A. Yes.

Q. 2010, correct?

A. Yes.

Q. Or any time before 2015?

A. Correct.

. . . .

Q. So you ignored your responsibilities as the manager because --

A. I won't say ignored.

Q. -- because you were treating him like a friend; is that it?

9

A. More than a friend.

Q. So you ignored your responsibilities outlined in the [C]ompany [A]greement to maintain the records, to maintain the assets, and you just relied on him and didn't do your job?

A. You cannot say I didn't do it. I was asking for that detail[], and he was delaying it. So -- but I could have [taken the] extra step to go find out, if I had suspected. I did not suspect him [of] doing that.

Samy made excuses about how his work schedule prevented him from obtaining Appellants' financial information but admitted that he could have contacted Downing via email and that he "should have done it, but [he] didn't do it."

During the trial, a chart was admitted that listed the amounts taken by Velu from 2009 to 2015. The chart showed that Velu had taken $73,000 in 2009 and $57,100 in 2010, for a total of $130,100. The chart further showed that the total amount taken by Velu during the 2009 to 2015 time frame—after deducting the taxes paid and his $25,000 repayment—was $232,663.73.

At the conclusion of the evidence, the trial court granted Appellants' motion for a directed verdict on their breach-of-fiduciary-duty claim. The jury considered Appellants' claims for fraud and malice and damages for theft, conversion, and breach of contract. The jury found no fraud or malice and returned a verdict for Appellants in the amount of $130,100 for the theft, conversion, and breach-of-contract claims.

A bench trial was later held on two dates, and the trial court heard evidence and argument on attorneys' fees, loss-of-use damages, and prejudgment interest.[7] The parties also filed briefs on the same issues. The trial court rendered a judgment on the jury's damages for the theft, conversion, and breach-of-contract claims; awarded trial attorneys' fees of $52,040; and awarded $0 prejudgment interest.

### III. Damages Found by the Jury

In their first issue, Appellants argue that the trial court erred when it failed to award what Appellants characterize as "the full amount of the damages" for the theft, conversion, and breach-of-contract claims—$232,663.73—notwithstanding the jury's verdict that reduced that amount. Because, as explained below, (1) the jury charge specifically allowed the jury to consider the time before Appellants discovered the stealing in reducing the damages to only $130,100, and because (2) some evidence supports the jury's finding that Appellants could have avoided incurring $102,563.73 by exercising reasonable care, the trial court did not err by not altering the jury's damage award.

#### A. Standard of Review

A trial court may disregard a jury's verdict and grant a JNOV if a directed verdict would have been proper. Tex. R. Civ. P. 301; *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991). We review the grant or denial of a motion

---

[7]A more detailed summary of the bench trial is set forth within the discussion of Appellants' second, third, and fourth issues.

for JNOV under a legal-sufficiency standard. *Tanner v. Nationwide Mut. Fire Ins.*, 289 S.W.3d 828, 830 (Tex. 2009); *Pointe W. Ctr., LLC v. It's Alive, Inc.*, 476 S.W.3d 141, 150 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). Therefore, because failure to mitigate damages is an affirmative defense, *Zimmerman Truck Lines, Inc. v. Pastran*, 587 S.W.3d 847, 862 (Tex. App.—El Paso 2019, no pet.), Appellants must show that no evidence supports the jury's mitigation finding, *see Graham Cent. Station, Inc. v. Peña*, 442 S.W.3d 261, 263 (Tex. 2014).

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Shields v. Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017); *see also Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (op. on reh'g). In determining whether legally sufficient evidence supports the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the

12

evidence" in support of the challenged finding. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018).

Anything more than a scintilla of evidence is legally sufficient to support a finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996); *see also 4Front Engineered Sols., Inc. v. Rosales*, 505 S.W.3d 905, 909 (Tex. 2016) ("The evidence is legally sufficient if . . . there is more than a scintilla of evidence on which a reasonable juror could find the fact to be true."). Scintilla means a spark or trace. *Scintilla*, Black's Law Dictionary (11th ed. 2019). More than a scintilla exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins.*, 77 S.W.3d 253, 262 (Tex. 2002); *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). On the other hand, when the evidence offered to prove a vital fact is so weak that it creates no more than a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003); *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

Without an objection to the jury charge, we review evidentiary sufficiency in light of the charge submitted. *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 221 (Tex. 2005) (citing *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001)).

13

## B. The Charge

The following damages question, which Appellants did not object to, contains a mitigation instruction:

**QUESTION 2**

It has already been found that Defendant Velumani Palaniswamy committed theft, conversion, and breach of contract against Asta. In answering this question, you are to determine the amount of damages, if any, resulting from the theft, conversion, and/or breach of contract.

What sum of money, if paid now in cash, would fairly and reasonably compensate Asta for such damages, if any?

In answering this question, you are not to consider any calculation or factor of interest, as this issue is to be determined by the Court.

Do not include in your answer any amount that you find Asta could have avoided by the exercise of reasonable care.

Consider the following elements of damages, if any, and none other. Answer separately in dollars and cents for damages, if any.

1. The amount of money unlawfully appropriated, taken, or converted by Defendant Velumani Palaniswamy.

$ 130,100

During closing argument, Velu's counsel walked the jury through Question 2. He pointed to the Company Agreement and Samy's duties as a co-manager under that agreement. He then told the jury that they would get to decide how long it was reasonable for Samy to wait before he did his job and suggested that they conclude that he should have waited no longer than one year.

## C. Relevant Trial Exhibits

The unobjected-to chart that follows sets forth the dates, the check numbers, and the amounts taken by Velu:

14

Summary of Known Funds Taken by Velu from Asta

| Date | Check Number | Amount | Annual Amount | Taxes Paid | Annual Net | Total Net |
|---|---|---|---|---|---|---|
| 2009.02.05 | Cash withdrawal | $3,000.00 | | | | |
| 2009.02.05 | 102 | $20,000.00 | | | | |
| 2009.06.12 | 101 | $39,000.00 | | | | |
| 2009.06.12 | 160 | $11,000.00 | | | | |
| | | | | | | |
| 2009 | | | $73,000.00 | | $73,000.00 | **$73,000.00** |
| | | | | | | |
| 2010.02.16 | 258 | $10,000.00 | | | | |
| 2010.03.25 | 5019 | $1,100.00 | | | | |
| 2010.11.13 | 5021 | $5,000.00 | | | | |
| 2010.12.06 | 5022 | $5,000.00 | | | | |
| 2010.12.10 | 406 | $22,000.00 | | | | |
| 2010.12.22 | 417 | $14,000.00 | | | | |
| | | | | | | |
| 2010 | | | $57,100.00 | $34,942.00 | $22,158.00 | **$95,158.00** |
| | | | | | | |
| 2011.01.14 | 5023 | $3,000.00 | | | | |
| 2011.02.09 | 5024 | $4,000.00 | | | | |
| 2011.04.25 | 467 | $3,781.00 | | | | |
| 2011.04.25 | 468 | $3,500.00 | | | | |
| 2011.12.12 | 570 | $18,000.00 | | | | |
| | | | | | | |
| 2011 | | | $32,281.00 | $36,602.00 | -$4,321.00 | **$90,837.00** |
| | | | | | | |
| 2012.02.07 | 600 | $6,000.00 | | | | |
| 2012.03.14 | 620 | $8,000.00 | | | | |
| 2012.04.11 | 633 | $3,811.42 | | | | |
| 2012.05.16 | 651 | $11,000.00 | | | | |
| 2012.10.23 | 103 | $34,000.00 | | | | |
| 2012.11.21 | 747 | $10,000.00 | | | | |
| 2012.12.21 | 761 | $8,500.00 | | | | |
| | | | | | | |
| 2012 | | | $81,311.42 | $35,646.00 | $45,665.42 | **$136,502.42** |
| | | | | | | |
| 2013.03.06 | 5027 | $15,000.00 | | | | |
| 2013.04.08 | 5028 | $12,000.00 | | | | |
| 2013.07.08 | 5031 | $10,000.00 | | | | |
| 2013.09.05 | 5033 | $5,000.00 | | | | |
| 2013.09.05 | 5032 | $5,000.00 | | | | |
| 2013.09.27 | 5034 | $7,500.00 | | | | |
| 2013.10.22 | 905 | $22,000.00 | | | | |
| 2013.12.19 | 933 | $14,070.31 | | | | |
| | | | | | | |
| 2013 | | | $90,570.31 | $36,070.00 | $54,500.31 | **$191,002.73** |

Plaintiff's Exhibit 15

15

Summary of Known Funds Taken by Velu from Asta

| Date | Check Number | Amount | Annual Amount | Taxes Paid | Annual Net | Total Net |
|---|---|---|---|---|---|---|
| 2014.02.24 | 5035 | $12,600.00 | | | | |
| 2014.03.22 | cash withdrawal | $3,000.00 | | | | |
| 2014.03.22 | 5037 | $3,000.00 | | | | |
| 2014.05.13 | 5036 | $5,000.00 | | | | |
| 2014.05.19 | 5038 | $15,000.00 | | | | |
| 2014.08.28 | 5041 | $5,000.00 | | | | |
| 2014.08.28 | 5042 | $9,500.00 | | | | |
| 2014.09.12 | 5043 | $3,000.00 | | | | |
| 2014.10.07 | 5046 | $2,000.00 | | | | |
| 2014.11.13 | 5047 | $5,000.00 | | | | |
| 2014.12.16 | 1113 | $30,000.00 | | | | |
| | | | | | | |
| 2014 | | | $93,100.00 | $36,439.00 | $56,661.00 | $247,663.73 |
| | | | | | | |
| 2015.02.25 | 1147 | $10,000.00 | | | | |
| | | | | | | |
| 2015 | | | $10,000.00 | $0.00 | $10,000.00 | $257,663.73 |
| | | | | | | |
| | | | | | | |
| | | Amount Taken | | Taxes Paid | | Net Taken |
| Known Totals | | $437,362.73 | | $179,699.00 | | $257,663.73 |
| | | | | | | |
| | | | | | | |
| 2016.03.31 | | -$25,000.00 | paid back by Velu Palaniswamy | | | |
| | | | | | | |
| 2016 | | | | | | $232,663.73 |
| | | | | | | |
| Net Amounts | | $412,362.73 | | $179,699.00 | | $232,663.73 |

The "Company Agreement of Asta Partners, LLC" was also admitted into evidence, and the jury heard testimony about Samy's duties as co-manager. Those duties included, among others,

> (a) entering into, making, and performing contracts, agreements, and other undertakings binding the Company that may be necessary, appropriate, or advisable in furtherance of the purposes of the Company and making all decisions and waivers thereunder, including a Fundamental Business Transaction;
>
> (b) opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money, and designating individuals with authority to sign or give instructions with respect to those accounts and arrangements;
>
> (c) maintaining the assets of the Company in good order; [and]
>
> . . . .
>
> (h) selecting, removing, and changing the authority and responsibility of lawyers, accountants, and other advisers and consultants[.]

**D.    Analysis**

The crux of Appellants' argument on appeal—that the jury could not have reduced the damages from the $232,633.73 net total shown on Appellants' chart—goes to the mitigation instruction. Appellants spend a full page of their brief stating what Velu was required to show in order to establish mitigation and citing cases on this topic. They argue that the jury could have only considered whether Appellants exercised reasonable care in avoiding damages after July 2015, when they actually discovered Velu's stealing. This is an attack on the scope of the trial court's

17

mitigation instruction within the damages question. Yet, Appellants did not object during the charge conference to the submission of the mitigation instruction, which does not so limit the jury's consideration of mitigation. Because Appellants did not object to the mitigation instruction contained in the damages question, we must examine the sufficiency of the evidence in light of the charge as given. *See id.*; *Bayer Corp. v. DX Terminals, Ltd.*, 214 S.W.3d 586, 604 (Tex. App.—Houston [14th Dist.] 2006, pet. denied); *see also Swank v. Sverdlin*, 121 S.W.3d 785, 802 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) ("We are not authorized to evaluate the sufficiency of the evidence under calculations different from those the jury were instructed to employ.").[8]

---

[8]In their reply brief, Appellants state that the language in the charge is from Texas Pattern Jury Charge 115.8 and then proceed to discuss comment 1 to the instruction:

> That the Pattern Jury Charge committee believed this language required the defendant to show that the damages were increased as a result of the plaintiff's action or inaction after the damages were inflicted is made clear by the comments to the instruction. According to the Committee, the instruction is used when "the evidence raises a question about the plaintiff's failure to mitigate damages after the defendant's actionable conduct" and requires that the "defendant must offer evidence showing not just the plaintiff's lack of care but also the amount by which the damages were increased by such failure to mitigate." [State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance & Employment* PJC 115.8 cmt. 1 (2018).] In other words, the Committee believes that this language requires the evidence to satisfy the conditions of Texas law regarding mitigation of damages, as outlined by [Appellants] in [their] Appellants' Brief and which [Velu] agrees is "a correct statement of the law."

18

Here, examining the sufficiency of the evidence in light of the charge as given, the jury was free to choose which amounts from the chart to include in its damages award. The jury was also required to follow the mitigation instruction and to exclude any amount that Appellants could have avoided by the exercise of reasonable care. Based on these instructions, the jury found damages of $130,100, which represents the total of the amounts taken by Velu in 2009 ($73,000) and in 2010 ($57,100).

---

> Essentially, [Velu] urges this Court to repudiate the Pattern Jury Charge Committee's work and declare that this instruction does not properly capture Texas law but instead allows for the reduction of damages for any reasons whatsoever. This instruction was not meant to be and is not a blank check for the jury to simply reduce the damages to be awarded to the plaintiff. [Velu] argues that the charge allows the jury to reduce the damages based on the theory that it could have found that [Appellants] *should have discovered* [Velu's] misconduct before it actually did. This is *not* evidence of the failure to mitigate damages, as [Velu] effectively concedes, is *not* what this instruction allows, and is *not* what this [c]ourt should interpret the Pattern Jury Charge instruction to allow.

Appellants thus attempt to distinguish between pre-actionable versus post-actionable conduct and argue that the mitigation instruction was not applicable to the damages here. But as pointed out above, Comment 1 specifically states, "If the evidence raises a question about the plaintiff's failure to mitigate damages *after* the defendant's actionable conduct, an instruction on mitigation should be included with the damages question." *Id.* (emphasis added). It does not limit the instruction to a failure to mitigate after discovery of the actionable conduct. Based on the arguments that Appellants raise on appeal, they should have objected during the charge conference in the trial court that the mitigation instruction was not properly limited in time, but they did not do that. Instead, without raising any objection, Appellants let the unlimited mitigation instruction remain in the charge. As we concluded above, it is Appellants' failure to object that prevents us from looking behind the charge that was given.

The jury implicitly determined that after repeated requests of Velu to provide the financials and no forthcoming reports, Samy should not have waited more than two years to obtain the financial information from other sources. The testimony at trial confirmed that the stolen funds could have been identified if Samy had requested the bank statements from PointBank or had accessed the statements or the canceled checks online. Moreover, it was Samy's job as a co-manager to maintain the assets of the company in good order, and he could not maintain the funds in the bank account without reviewing the financial documents. Instead, he asked Velu quarterly for financial statements for six years, received nothing, and took no further action despite having direct access to the bank account, the accountant, and the property-management company.

Appellants argue that because they did not learn of the theft until the summer of 2015 and immediately took steps to remove Velu from control of its finances, there is no evidence that anything Appellants did constituted a lack of reasonable care. But "[t]he mitigation standard is that of ordinary care—what an ordinary prudent person would do in the same or similar circumstances." *See Pulaski Bank & Tr. Co. v. Tex. Am. Bank/Fort Worth, N.A.*, 759 S.W.2d 723, 736 (Tex. App.—Dallas 1988, writ denied). Here, more than a scintilla of evidence supports that an ordinary prudent person acting as a co-manager with specific duties under the Company Agreement would not have waited more than two years to seek financial information from the LLC's bank, accountant, or property-management company when no financial

20

information was being supplied after repeated requests to the other co-manager. *See id.* ("It takes no special expertise to discern that it was unwise to allow Lab Management to continue to withdraw money that did not belong to it.").

Based on the testimony and evidence presented, we conclude that the jury's determination—that Appellants should not recoup more than $130,100 (the total of the amounts taken by Velu in 2009 and 2010) because they failed to exercise reasonable care—is supported by more than a scintilla of evidence. *See Cont'l Coffee Prods.*, 937 S.W.2d at 450; *Leitch*, 935 S.W.2d at 118; *see also Pulaski Bank & Tr. Co.*, 759 S.W.2d at 736 (holding that bank could not recover the funds attributable to its failure to mitigate). And having concluded that the evidence is sufficient to support the jury's damage award, we hold that the trial court did not err by leaving the jury's damage award unchanged. *Cf. Mundheim v. Lepp*, No. 05-19-01490-CV, 2021 WL 1921122, at *7 (Tex. App.—Dallas May 13, 2021, pet. filed) (mem. op.) ("Having found the evidence sufficient to support the complained-of jury findings, we conclude [that] the trial court did not err [by] denying the [appellants'] motion for judgment notwithstanding the verdict and motion for new trial."). We overrule Appellants' first issue.

## IV. Attorneys' Fees Awarded by the Trial Court

In their third issue, Appellants argue that the amount of attorneys' fees awarded by the trial court "was improper and ought to be corrected" by this court. Appellants challenge the legal and factual sufficiency of the trial court's award of trial

21

attorneys' fees in the amount of $52,040—which was calculated by applying the contracted-for 40% contingency fee to the jury's damages award of $130,100—and the trial court's failure to award any appellate attorneys' fees. As discussed below, the trial court's findings of fact demonstrate that it did not follow the lodestar method of calculating trial attorneys' fees but relied solely on the contingency-fee arrangement, which was error. Additionally, the trial court abused its discretion by not awarding appellate attorneys' fees because case law mandates that if an award of trial attorneys' fees is mandatory under an authorizing statute, then an award of appellate attorneys' fees is likewise mandatory if proof of reasonable fees is presented. *See Ventling v. Johnson*, 466 S.W.3d 143, 154 (Tex. 2015).

A.    **Standard of Review**

We review a trial court's award of attorneys' fees for an abuse of discretion. *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 761 (Tex. 2012). A trial court abuses that discretion if it acts arbitrarily, unreasonably, or without regard to guiding legal principles, or if its decision is not supported by legally or factually sufficient evidence. *See Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998); *see also Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991) (explaining that legal and factual sufficiency of the evidence are relevant factors in determining whether the trial court abused its discretion).

## B.    Applicable Law

The Texas Supreme Court laid out the framework for determining attorneys'

fees in *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*:

[T]he lodestar method as we presented it in *El Apple* applies for determining the reasonableness and necessity of attorney's fees in a fee-shifting situation:

> Under the lodestar method, the determination of what constitutes a reasonable attorney's fee involves two steps. First, the [factfinder] must determine the reasonable hours spent by counsel in the case and a reasonable hourly rate for such work. The [factfinder] then multiplies the number of such hours by the applicable rate, the product of which is the base fee or lodestar. The [factfinder] may then adjust the base lodestar up or down (apply a multiplier), if relevant factors indicate an adjustment is necessary to reach a reasonable fee in the case.

370 S.W.3d at 760 (citations omitted). Thus, the fact[]finder must first determine a base lodestar figure based on reasonable hours worked multiplied by a reasonable hourly rate. *Id.* In a jury trial, the jury should be instructed that the base lodestar figure is presumed to represent reasonable and necessary attorney's fees, but other considerations may justify an enhancement or reduction to the base lodestar; accordingly, the fact[]finder must then determine whether evidence of those considerations overcomes the presumption and necessitates an adjustment to reach a reasonable fee. *Id.* at 765; *see also Perdue*[ *v. Kenny A. ex rel. Winn*], 559 U.S. [542,] 558–59, 130 S. Ct. [1662, 1676–77 (2010)] (suggesting that adequate appellate review is only feasible when the fact[]finder makes reasonably specific findings as to each step of the fee determination). *Arthur Andersen* lists relevant considerations that may justify an adjustment, but . . . considerations already incorporated into the base calculation may not be applied to rebut the presumption that the base calculation reflects reasonable and necessary attorney's fees. *See Arthur Andersen*[ *& Co. v. Perry Equip. Corp.*], 945 S.W.2d [812,] 818 [(Tex. 1997)]; *cf. Perdue*, 559 U.S. at 553, 130 S. Ct. [at 1673]; [*City of*] *Burlington*[ *v. Dague*], 505 U.S. [557,] 562–63, 112 S. Ct. 2638[, 2641 (1992)]; *Blum*[ *v. Stenson*], 465 U.S. [886,] 898–900, 104 S. Ct. 1541[, 1548–50 (1984)].

General, conclusory testimony devoid of any real substance will not support a fee award. Thus, a claimant seeking an award of attorney's fees must prove the attorney's reasonable hours worked and reasonable rate by presenting sufficient evidence to support the fee award sought. *See Long*[ *v. Griffin*], 442 S.W.3d [253,] 255–56 [(Tex. 2014)]; [*City of Laredo v.*] *Montano*, 414 S.W.3d [731,] 736–37 [(Tex. 2013)]; *El Apple*, 370 S.W.3d at 763–64. Sufficient evidence includes, at a minimum, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services. *See El Apple*, 370 S.W.3d at 762–63.

578 S.W.3d 469, 501–02 (Tex. 2019).

## C. Evidence Presented

Appellants' attorney, Mike Yanof, testified that he had twenty-two years of experience as a trial and appellate specialist and that he was a partner with the Lenahan Law Firm. Yanof explained that he was hired in this case because the originating attorney was not a trial specialist and wanted him to take over the case as there were pending Rule 91a motions seeking dismissal of the case. *See* Tex. R. Civ. P. 91a. He said that Appellants' goal was to be made whole and that they wanted their attorneys to determine how much Velu had taken because they had no idea of the amount as the numbers of how much had been taken differed widely. Yanof testified that the total of the funds taken was in dispute until the Sunday night before trial and that, although it was very difficult to put the pieces of the puzzle together, the amount in controversy was ultimately determined to be $232,000.

Yanof testified that his hourly rate of $575 was a reasonable rate that is customarily and routinely charged in the DFW area. He said that he had seen rates of $450 to $800 per hour for twenty-year attorneys. Yanof stated that he was not asking for an upward departure from the actual time spent on the case, which was billed in 0.1 increments, times $575 per hour. Yanof testified that the case was handled on a contingency-fee contract but that he had not factored that into the fees sought.

A ledger reflecting attorneys' fees based on the time spent on various tasks—without regard to the contingency-fee agreement—was admitted into evidence.[9] The hours are not totaled on the exhibit, but our summation of the hourly entries reveals that 588.4 hours were spent.[10] Multiplying the 588.4 hours by the hourly rate of $575 results in $338,330 for total attorneys' fees through the date of the bench trial. Yanof testified that the time spent for each of the tasks listed on the exhibit represented reasonable and necessary hours and fees for the case.

When asked whether he had segregated fees in the billing, Yanof testified,

I did. Well, let me clarify. I segregated fees for liability. There were different claims in this case and individual causes of action, and the discrete tasks that I did for the individual causes of action when I took

---

[9]The exhibit was admitted over the following responses from Velu's attorney: "I have objections to the sufficiency of the evidence to support the attorneys' fees, but not to . . . that[;] that is a true and correct chart of the fees that they have calculated," and "on the attorneys' fees, I have several arguments[,] . . . but those, I think, are objections to the evidence, not to the exhibits."

[10]Yanof testified that the only estimates on the chart were for the bench trial held on October 23, 2019, but he explained that based on how long the hearing had lasted, he had underestimated those amounts.

over the case and particularly when I amended the petition, the research I did for the fraud, breach of fiduciary duty, and conversion claims, I segregated those fees out and at times I just did not bill them at all. But for amending the petition and for the initial research, I noted that I was exempting those out of the fees in [the fees exhibit].

When it came to damages, I did not segregate fees because there [was] one set of damages. They were intertwined. All of the damages were intertwined regardless of the claims. That's evidenced by the fact that there was ultimately a single damage question submitted to the jury, and it was not tied to particular claims. And we never had a damage model that was separate for different claims.

And so the damages were inextricably intertwined, . . . and they could not be separated out.

He explained that getting paid for this case would be difficult because, "for starters, it's a contingency[-]fee case tied to collecting the judgment." Yanof said that what "makes it a little more unique is that there's serious collectibility issues." He said that he had information that there may be funds to collect the judgment but that it might take going to India to collect the assets.[11]

Yanof testified that he had given Appellants value based on "[f]irst and foremost, the result." He explained that after taking over the case while Rule 91a motions to dismiss were pending, he positioned the case to obtain a summary judgment on the theft, conversion, and breach-of-contract claims and ensured that he would recover attorneys' fees. Yanof also made sure that the firm had only twenty-

---

[11]When Yanof retook the stand during rebuttal, Velu's attorney questioned him on the collectibility of the judgment. Yanof testified that he understood that he could get a charging order on Velu's interest in the LLC and that he knew that Velu had "stuff of value."

26

plus-year attorneys working on the case because associates tend to bill for excessive research, while two twenty-plus-year partners did "what [was] absolutely essential on the case to position it to place [their] clients in the best position." Yanof opined that his firm had obtained "a very good result" for Appellants and had obtained hundreds of pages of records, "many of which [were from accounts that] Velu [had] not agree[d] in his deposition . . . were his bank accounts."

When asked whether taking this case precluded him from taking other work, Yanof said, "It potentially did." He then explained that he serves as the "med-mal go-to person" in the firm and that he had turned down a number of med-mal cases while working on this case because "it was not realistic to take any med-mal case that would need to be filed in the next five months" due to the time that it takes to prescreen and obtain experts to review that type of case. Additionally, Yanof said that all other cases stood still while he was working on this case and that this case kept him from moving the firm's other cases.

When asked about the nature, length, and professional relationship with Appellants, Yanof stated this is a one-time lawsuit. As a result, Yanof said that there is no expectation that Appellants will have other litigation, so there was no discounted fee as there is when dealing with a volume client or an institutional client that provides him with "lots of work."

Yanof was also asked about his experience with appellate matters. Yanof cataloged his experience in handling appeals for twenty years at the various levels,

including the Texas Supreme Court and various circuit courts. Yanof opined that $575 per hour is a reasonable rate for appellate work "here"—in this area. Yanof estimated that an appeal to the Second Court of Appeals would take 50 hours[12] at $575 per hour for a total of $28,750. Yanof estimated that filing a petition for review in the Texas Supreme Court would take 30 hours[13] at $575 per hour for a total of $17,250. Yanof estimated that filing a brief on the merits in the Texas Supreme Court would take 80 hours[14] at $575 per hour for a total of $46,000.

Velu's attorney, Samuel B. Burke, cross-examined Yanof. Yanof confirmed that Appellants had contracted for a 40% contingency-fee agreement, so 40% is all that Appellants are obligated to pay his firm. When asked what percentage of the trial preparation was necessary because of the fraud and exemplary-damages claims, Yanof testified that he did not attribute any time to those causes of action because the trial came down to damages, and the damages were the same for every cause of action.

---

[12]Yanof broke down the 50 hours as follows: 10 hours to designate portions of the record and review the entire record, including the jury trial; 25 hours to research issues to be raised in the briefs and to draft any reply; 10 hours to prepare for oral argument; and 5 hours to travel and to give the oral argument.

[13]Yanof broke down the 30 hours as follows: 5 hours to research for the petition for review and 20 hours to draft the response to the petition for review, but he did not account for the remaining 5 hours.

[14]Yanof broke down the 80 hours as follows: 10 hours to research; 30 hours to draft the brief; 30 hours to prepare for oral argument; and 10 hours to travel and to give the oral argument.

Burke offered rebuttal testimony on the issue of Appellants' attorneys' fees. Burke, who had been licensed for 21 years, testified that a reasonable rate in this case in this locality is between $400 and $450 and that a rate of $575 is excessive and is not consistent with the market.

Burke stated that the initial disclosure that was served on March 31, 2017, sought $216,298.44 in damages. Burke testified that the case was mediated in August and that approximately 500 hours of attorney time had been spent on the case since the mediation. The net result of that work was an increase in damages from $216,000 to $232,000. Burke opined, "That's not reasonable[,] and it's not necessary."

Burke further critiqued the type of work that the attorneys had performed. Burke pointed out that Appellants used attorneys with an hourly rate of $575 to go through canceled checks and calculate the amount that Velu had stolen.

Burke mentioned the contingency-fee agreement and said that if Appellants had not had a contingency-fee agreement and had instead been paying $575 per hour, "they wouldn't have had their $575-an-hour lawyer counting checks. They'd have done it a different way, and you wouldn't have this excessive legal bill here." Burke suggested to the trial court,

> If you simply want to compensate [Appellants] for what they were out -- in other words, what it cost them to get here -- it's $52,000, and they are saying a reasonable and necessary fee is $338,000. In my experience, that's not true and it's not reasonable and necessary[] and it's certainly not in Denton County in a case like this.

29

Burke further testified that a reasonable and necessary fee in this case is "somewhere between $22,000, which is about what had been incurred up to the point of mediation, and $52,000, which is what these people actually will owe Mr. Yanof based on his 40 percent contingency fee."

**D.    Trial Court's Findings and Conclusions on Attorneys' Fees**

The trial court made the following findings of fact and conclusions of law related to attorneys' fees:

> 6.    The [c]ourt finds that a significant portion of the attorneys' fees sought by [Appellants] were excessive and that a significant part of the work performed by [Appellants'] counsel was not reasonable or necessary.
>
> 7.    The [c]ourt finds that for significant portions of the work performed by [Appellants'] counsel $575.00 per hour was not a reasonable hourly rate.
>
> 8.    The [c]ourt finds the reasonable amount necessary to compensate [Appellants] for the fees actually incurred was $52,040.00.[15]
>
> 9.    The [c]ourt finds the total hourly fees requested by [Appellants] were unreasonable and excessive given the nature of the claim and the size of the recovery.

---

[15]The final judgment states how the amount of trial attorneys' fees was calculated:

> Accordingly, after the jury trial concluded, [Appellants] and [Velu] appeared before the [c]ourt and presented evidence, authorities, and arguments regarding the award of attorneys' fees to [Appellants], . . . and the [c]ourt having consider[ed] same and the pleadings and records on file in this [lawsuit] found that [Appellants] should be awarded their attorneys' fees in the amount of $52,040.00 (40% of the jury verdict of $130,100.00)[.]

. . . .

5. The fees requested by [Appellants] in excess of $52,040.00 were not reasonable or necessary[] and were excessive.

## E. Analysis of Award of Trial Attorneys' Fees

As set forth above, Appellants presented evidence that two attorneys who charged $575 per hour had spent 588.4 hours working on the case, for a total of $338,330 in trial attorneys' fees. The chart that they presented contains evidence of (1) the particular services performed, (2) who performed the services, (3) when the services were performed, and (4) the time required to perform the services. Yanof testified to the reasonableness of the hourly rate and the time spent on the case. Burke challenged the reasonableness of the hourly rate, stating that it was significantly higher than the usual $400 to $450 that was reasonable for similar attorneys in the area, and challenging whether it was necessary to use partner-level attorneys to go through checks and bank statements to determine how much Velu had stolen from Appellants. The evidence presented thus informed the trial court of the time spent on specific tasks and enabled the trial court to meaningfully review the requested fees.

The trial court's findings of fact demonstrate that the trial court found Appellants' trial attorneys' $575 hourly rate to be unreasonable for "significant portions of the work [that they] performed." The trial court's findings, however, do not demonstrate that the trial court determined what a reasonable rate should be for

such work. Instead, the trial court, as reflected in the final judgment, chose to calculate Appellants' trial attorneys' fees based solely on the contingency-fee agreement of 40% of the damages awarded by the jury. The award of trial attorneys' fees based on this calculation cannot stand.

As set forth in *Rohrmoos*, the factfinder must first perform a lodestar calculation based on reasonable hours worked multiplied by a reasonable hourly rate. 578 S.W.3d at 501. We have no indication that the trial court determined the reasonable hours worked or a reasonable hourly rate. The trial court instead skipped this step and relied solely on the contingency-fee agreement. A contingency-fee agreement, however, is only one factor that is considered when calculating the lodestar and cannot be the only factor used to determine attorneys' fees. *See Arthur Andersen*, 945 S.W.2d at 818–19 (holding that although "[a] contingent fee may indeed be a reasonable fee from the standpoint of the parties to the contract," it is not "in and of itself reasonable for purposes of shifting that fee to the defendant"); *State Office of Risk Mgmt. v. Olivas*, 509 S.W.3d 499, 508 (Tex. App.—El Paso 2016, no pet.) (stating that a contingency-fee agreement is a factor for a court to consider in making a fee award, but it cannot be the only factor).

Even if we presume that the trial court made a base lodestar calculation, the trial court was not allowed under the second step of the lodestar method to reduce the calculation based on the contingency-fee agreement. *See Rohrmoos*, 578 S.W.3d at 501 (stating that the *Arthur Andersen* considerations, such as the existence of a

contingency-fee agreement, already incorporated into the base calculation may not be applied to rebut the presumption that the base calculation reflects reasonable and necessary attorneys' fees); *cf. City of Burlington*, 505 U.S. at 562–63, 566–67, 112 S. Ct. at 2641, 2643–44 (disallowing an *enhancement* for contingency-fee agreement because it would likely duplicate in substantial part considerations already subsumed in the base lodestar calculation, as "[t]he risk of loss in a particular case (and, therefore, the attorney's contingent risk) . . . is ordinarily reflected in the lodestar—either in the higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so").

Based on the evidence presented, Appellants may not have been entitled to recover all of their requested attorneys' fees, but they were statutorily entitled to their reasonable attorneys' fees incurred. *See generally* Tex. Civ. Prac. & Rem. Code Ann. §§ 38.001(b)(8) (permitting award of attorneys' fees for successful breach-of-contract claim), 134.005 (permitting award of attorneys' fees for successful claim under the Texas Theft Liability Act). We conclude that the trial court's award of trial attorneys' fees based solely on the contingency-fee agreement is without reference to the guiding principles set forth in *Rohrmoos* and is legally insufficient. *See* 578 S.W.3d at 501. We therefore hold that the trial court abused its discretion by awarding trial attorneys' fees of $52,040. Accordingly, we sustain the portion of Appellants' third issue challenging the amount of trial attorneys' fees.

**F.      Analysis of Award of No Appellate Attorneys' Fees**

Appellants also argue within their third issue that the trial court's failure to award them appellate attorneys' fees is both legally and factually insufficient. Velu's brief does not respond to Appellants' argument regarding appellate attorneys' fees.

When, as here, trial attorneys' fees are mandatory under a statute, then appellate attorneys' fees are also mandatory when proof of reasonable fees is presented. *See Ventling*, 466 S.W.3d at 154. Here, Appellants provided opinion testimony about the services that they reasonably believed would be necessary to defend the appeal and the hourly rate for those services. Even if the trial court determined that the hourly rate of $575 was not reasonable, the trial court had no discretion to determine that Appellants were not entitled to any conditional appellate attorneys' fees. Because the trial court's failure to award appellate attorneys' fees is without reference to the guiding principles set out in *Ventling*, we hold that the trial court abused its discretion by failing to award Appellants their appellate attorneys' fees. *See DaimlerChrysler Motors Co. v. Manuel*, 362 S.W.3d 160, 198–99 (Tex. App.—Fort Worth 2012, no pet.) (remanding case for a new trial concerning the amount of reasonable and necessary appellate attorney's fees because the trial court had awarded none despite such fees being mandatory under Section 38.001). We therefore sustain the remaining portion of Appellants' third issue challenging the trial court's failure to award appellate attorneys' fees.

## V. Zero Prejudgment Interest Awarded by the Trial Court

In their fourth issue, Appellants argue that the trial court abused its discretion by failing to award prejudgment interest. As explained below, any prejudgment interest award in this suit could only be based on general principles of equity, according to which the trial court did not abuse its discretion by denying prejudgment interest under the facts presented.

### A. Law on Prejudgment Interest

This court has previously summarized the law on prejudgment interest:

> An award of prejudgment interest advances two ends: 1) achieving full compensation to plaintiffs; and 2) expediting both settlements and trials. The two legal sources for a prejudgment interest award are 1) general principles of equity, and 2) an enabling statute. The enabling statute, Texas Finance Code [S]ection 304.104, only applies to wrongful death, personal injury, and property damage cases. Where no statute controls the award of prejudgment interest, the decision to award prejudgment interest is left to the sound discretion of the trial court, which should rely upon equitable principles and public policy in making this decision.

*Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 486–87 (Tex. App.—Fort Worth 2004, no pet.) (op. on reh'g) (footnotes omitted).

### B. Applicable Findings of Fact and Conclusions of Law

The trial court made the following finding of fact and conclusions of law related to prejudgment interest:

> 5. Further, the [c]ourt finds an offer of settlement was tendered by [Velu] exceeding the amount of the judgment before the [suit] began.
>
> . . . .

35

## CONCLUSIONS OF LAW

. . . .

3.  Prejudgment interest is "compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Cavnar v. Quality-Control Parking, Inc.*, 696 S.W.2d 549, 552 (Tex. 1985) (citing McCormick, Damages § 50 (1935)).

4.  No pre[]judgment interest is recoverable by [Appellants].

### C.  Evidence Regarding Settlement Offer

The record reflects that on April 7, 2016, Appellants demanded that Velu and Selvi pay $206,500 within 10 days after receiving the demand letter. On May 12, 2016, Velu and Selvi made an offer of settlement. In the letter that Velu's counsel sent to Appellants' then-attorney, Velu and Selvi asked Appellants' members to agree to accept (1) a transfer of Velu's and Selvi's membership interests in the two entities (stating that the "book value" of their interests was $110,000); (2) the payment that they previously made in the amount of $25,000; and (3) an additional payment in the amount of $14,000. The settlement offer further states, "If this offer is acceptable, please provide direction regarding to whom [Velu's] and Selvi['s] membership interests should be assigned and to whom the additional $14,000.00 payment should be made." Thus, the total amount of the settlement offer (calculated using the book value stated in the letter) was $149,000. The offer was not accepted.

At the outset of the bench trial, the trial court agreed to take judicial notice of the jury trial and to consider all the previously admitted evidence. During the jury

trial, Samy had testified that Velu and Selvi each owned a 5.5% interest (or 11% total) in Appellants. The Company Agreement calls for a member's interest to be determined as follows:

> 14.07 **Determination of Fair Value**. The "Fair Value" of a Membership Interest shall be the amount that would be distributable to the Member holding such interest in the event that the assets of the Company were sold for cash and the proceeds, net of liabilities, were distributed to the holders of all Membership Interests pursuant to this Agreement. In the event that the Fair Value of a Membership Interest is to be determined under this Agreement, the Members shall select a qualified independent appraiser to make such determination, and the Members shall make the books and records available to the appraiser for such purpose. The determination of Fair Value made by such appraiser shall be final, conclusive, and binding on the Company, all Members, and all Assignees of a Membership Interest.

Velu's counsel questioned Samy about valuing a member's interest and referenced the Company Agreement:

> [By Defense Counsel:] So, generally speaking, Article 14 deals with buy-out of [a] membership interest, correct?
>
> A. Correct.
>
> Q. And it deals with several different scenarios, death of a member, bankruptcy of a member, insufficient surplus, other members' options to purchase, and then it has Sections 14.06, 14.07, and 14.08, which deal with an exercise of an option to purchase. Do you see that?
>
> A. Yes, I see it.
>
> Q. Okay. And Section 14.07 deals with how we're going to value a member's interest, correct?
>
> A. Correct.

Q. Okay. And it has a definition of fair value. It says[, "]The fair value of a membership interest shall be [the] amount that would be distributed to the member holding such interest in the event that the assets of the company were sold for cash and the proceeds net of liabilities were distributed to the holders of all membership interests pursuant to this agreement.["]

Have I read that correctly?

A. Yes.

. . . .

Q. Well, so you knew in 2015 that Velu had taken money in breach of the [C]ompany [A]greement, correct?

A. Correct.

Q. Okay. And there were actually some discussions about applying his membership interest to the debt, correct?

A. There may have been.

Q. Okay. And so those conversations should have referenced the [C]ompany [A]greement and followed those provisions. Do you agree with that?

A. No. We rejected his claim about submitting his shares because we are focused on getting the money back that he has taken. We never admitted about using his shares.

Q. You have refused to use this procedure?

A. No. We are focused on getting the money he has taken.

Q. Okay. So in . . . the summer of 2015, what were the value of the company assets?

A. That requires an appraisal, so . . . I don't know.

Q. Did you request an appraisal?

A.  We did not.

. . . .

Q.  Do you have any idea how much an appraisal in 2015 would have cost the company?

A.  I don't know.

Q.  Have you investigated that at all?

A.  We never thought about appraising.

Velu put on valuation evidence through Greg Johnson—a commercial real estate broker, a real estate developer, and an investor.  Johnson testified that he was qualified to value the property owned by Appellants.  For the building owned by Appellants, Johnson reviewed the rent roll, analyzed the tenant types, and performed a calculation using the net operating income of $175,000 and a 7% cap rate[16] to come up with a purchase price of $2.5 million.  To make sure that the $2.5 million was a realistic number of "what the market would have paid," Johnson reviewed actual sales

---

[16]Johnson explained the cap rate as follows:

[I]n the real estate world, we shorten that to cap rate.  It's actually capitalization rate.  Essentially, what that means is if you paid cash for the property, that's what your return on investment would be every . . . year.

So, for example, a 7 percent cap rate -- there's a mathematical formula to determine what's the value of the property.  You take the net income and you divide that by 7 percent, and that will give you the value of what you could pay for it.  If you paid cash, that would mean you would get 7 percent return on your money every year that the rent stayed the same.

and noted that the cap rates ranged "from 6.4ish up into the mid 8's." After looking at comparable sales, Johnson testified that the sales price "would have been a little north of the $2.5 million." Johnson said, "I felt like if somebody said, [']Can you sell this building for $2.5 million,['] I'd put my name on it and say, [']Yes.[']"

The evidence during the jury trial also showed that Appellants' sole debt was the loan from PointBank for the mortgage on the building. A chart was admitted into evidence showing that the outstanding amount on the loan around the time of Velu's settlement offer was $1,145,181.25.[17]

Using the sales price determined by Johnson and the outstanding amount on the loan as shown on the loan chart, Velu's attorney in his appellate brief calculated Velu's and Selvi's membership interest as follows:

| | |
|---|---|
| $2,500,000.00 | Value of the property if sold for cash |
| ($1,145,181.00) | Less mortgage on the property |
| $1,354,819.00 | Value of asset net of liability that could be distributed |
| x .11 | Velu and Selvi's interest as a percentage |
| $ 149,030.09 | Value of Velu and Selvi's joint membership interest |

During the bench trial, Velu's attorney argued, "The uncontradicted evidence at trial was that the value of that interest was $146,000[,[18] which is] an amount in excess of what the jury awarded." He explained that this differs from the book-value offer,

_____

[17]Velu's brief uses the amount remaining as of May 31, 2016, instead of the amount remaining as of May 2, 2016, which was closer in time to the date of the offer. The May 2, 2016 amount was $1,148,839.36 and would have valued Velu and Selvi's joint membership interest at $148,627.67.

[18]It is not clear why Velu's attorney used $146,000 instead of $149,000.

40

but "if you take the equity, the fair value, then the value of that interest was $146,000. It's the equity in the real property plus the $14,000 in the bank account times 11 percent, $146,000." In addition to Velu's and Selvi's membership interests, their settlement offer also included the $25,000 that they had previously paid and an additional $14,000, thus bringing the settlement offer to over $188,000.

## D.     Analysis

Here, Appellants agree that there is no statute allowing for the recovery of prejudgment interest for the claims on which they prevailed. Thus, the trial court was permitted to rely on equitable principles and public policy in deciding whether to award prejudgment interest.

In making the decision not to award prejudgment interest, the trial court heard evidence on the various values placed on Velu's and Selvi's membership interests. Because the Company Agreement specified that "fair value" was to be used in calculating the value of a membership interest, the trial court could have determined that Appellants had thwarted the process of determining the fair value by not requesting an appraisal pursuant to the terms of the Company Agreement. The trial court could have further determined that Velu's May 2016 settlement offer—whether using either the book value of the membership interests as stated in the offer of settlement ($110,000) or the value of the membership interests calculated using the sales price as determined by Johnson ($149,000) and the remaining loan balance from the loan chart, plus applying the additional $25,000 prior payment and the $14,000

41

cash payment—exceeded the amount that the jury awarded Appellants for damages. Either total—the $149,000 and the $188,000—constitute more than a scintilla of evidence to support the trial court's decision that it was equitable to deny prejudgment interest because Appellants had rejected a settlement offer that exceeded the $130,100 in damages awarded by the jury. *See Hameed Agencies (pvt) Ltd. v. J.C. Penney Purchasing Corp.*, No. 11-05-00140-CV, 2007 WL 431339, at *6–7 (Tex. App.—Eastland Feb. 8, 2007, pet. denied) (mem. op.) (considering settlement offer that exceeded appellant's recovery in affirming trial court's decision not to award prejudgment interest in contract dispute).

Appellants rely on a case from this court to argue that there is no authority authorizing the trial court to deprive them of equity-based prejudgment interest based on their refusal to accept a settlement offer. *See AMX Enters., L.L.P. v. Master Realty Corp.*, 283 S.W.3d 506 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g). The prejudgment interest in *AMX Enterprises*, however, was awarded based on an enabling statute—the Prompt Payment to Contractors Act. Because the case was decided under an enabling statute—not general principles of equity—and did not discuss whether settlement offers can be considered in determining whether to award prejudgment interest according to equitable principles, *AMX Enterprises* is thus distinguishable.[19]

---

[19]Moreover, after *AMX Enterprises*, this court remanded a breach-of-contract case for the trial court to recalculate the correct amount of prejudgment interest

In their reply brief, Appellants argue for the first time that Velu's offer to settle the claim did not include "the actual production of funds to pay the amount due" because Velu offered only an ownership interest; and as a result, "the alleged 'offer' is not a 'tender' triggering this rule [preventing any prejudgment interest from accruing]."[20] An "appellant may file a reply brief addressing any matter in the appellee's brief," *see* Tex. R. App. P. 38.3, but "[t]he Texas Rules of Appellate Procedure do not allow an appellant to include in a reply brief a new issue in response to some matter pointed out in the appellee's briefs but not raised by the appellant's original brief." *Jennings v. Jennings*, 625 S.W.3d 854, 868–69 (Tex. App.—San Antonio 2021, pet. filed); *Dall. Cnty. v. Gonzales*, 183 S.W.3d 94, 104 (Tex. App.—Dallas 2006, pets. denied) (op. on reh'g). Appellants waived this contention by raising it for the first time in their reply brief. *See Pineridge Assocs., L.P. v. Ridgepine, LLC*, 337 S.W.3d 461, 472 n.10 (Tex. App.—Fort Worth 2011, no pet.).

Having held that there is more than a scintilla of evidence to support the trial court's decision to award $0 prejudgment interest under these facts, we hold that the

---

"[b]ecause neither party ha[d] briefed what date should apply, and because appellants claim that they are entitled to the tolling of the accrual of interest while a settlement offer was open." *See Dall. Area Rapid Transit v. Agent Sys., Inc.*, No. 02-12-00517-CV, 2014 WL 6686331, at *16 (Tex. App.—Fort Worth Nov. 26, 2014, pet. denied) (mem. op.).

[20]Appellants appear to ignore that Velu's settlement offer included a prior payment of $25,000 and an offer to pay $14,000 in cash.

trial court did not abuse its discretion by denying prejudgment interest. We overrule Appellants' fourth issue.

## VI. Zero Loss-of-Use Damages Awarded by the Trial Court

In their second issue, Appellants argue that the trial court erred by rejecting their claim for compensatory damages for loss of use of the money taken by Velu and that we should reverse and render judgment to include an award of those damages. As discussed below, Appellants failed to conclusively establish that they had incurred loss-of-use damages for allegedly not being able to prepay the mortgage.

### A. Standard of Review

A trial court's findings of fact have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). As with jury findings, a trial court's fact-findings on disputed issues are not conclusive, and, when the appellate record contains a reporter's record, an appellant may challenge those findings for evidentiary sufficiency. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Super Ventures, Inc. v. Chaudhry*, 501 S.W.3d 121, 126 (Tex. App.—Fort Worth 2016, no pet.). We review the sufficiency of the evidence supporting challenged findings using the same standards that we apply to jury findings. *Catalina*, 881 S.W.2d at 297.

Additionally,

> [i]n a bench trial, the trial court is the factfinder and sole judge of the credibility of the witnesses. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). "Accordingly, the trial court may consider all the facts and

44

circumstances in connection with the testimony of each witness and accept or reject all or part of that testimony." *Hailey v. Hailey*, 176 S.W.3d 374, 383 (Tex. App.—Houston [1st Dist.] 2004, no pet.). The trial court may believe one witness, disbelieve others, and resolve inconsistencies in any testimony. *McGalliard*, 722 S.W.2d at 697. "An appellate court may not substitute its judgment for the trial court's assessment of witnesses' testimony in a bench trial." *Hailey*, 176 S.W.3d at 383.

*12636 Rsch. Ltd. v. Indian Bros., Inc.*, No. 03-19-00078-CV, 2021 WL 417027, at *5 (Tex. App.—Austin Feb. 5, 2021, no pet.) (mem. op.).

## B.    Law on Omitted Findings

A recent case from the Austin Court of Appeals demonstrates how appellate courts handle omitted, unrequested findings and their practical effect on the court's holding:

> [W]hile [appellant] may have satisfied his burden with respect to the elements of existence of and breach of the duty, it does not necessarily follow that he is entitled to relief from that grievance. Texas law affords an aggrieved individual several remedies for breach of fiduciary duty. . . . In this case, as compensation for the breach of fiduciary duties, [appellant] sought an additional $71,778.40 in damages. [Appellant] derives this sum from evidence of monies Garcia obtained while operating Active Euroworks and from his theory that "all of the profits and payments would have been split between Garcia and [appellant]" had Garcia not breached his fiduciary duty by opening and operating the competing enterprise. However, the district court made no finding regarding Garcia's profits from the operation of Active Euroworks. Moreover, [appellant] presumes that all of Garcia's profits were made while the two men were still partners, but the district court made no finding regarding the date the partnership ended. Nor did either party specifically request any findings regarding the alleged breach of fiduciary duty or any profit Garcia might have made while operating Active Euroworks. As an appellate court, we must assume that any omitted, unrequested findings support the judgment. *See* Tex. R. Civ. P. 299; *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989); *Williams v. Milliger*,

352 S.W.2d 794, 795 (Tex. App. 1961, writ ref'd n.r.e.) ("It is implied in support of the judgment that the court found against the defendant on this issue since the court made no specific finding on such issue and none was requested."). In other words, we must infer that the district court concluded: (1) that the fiduciary relationship had already ended when Garcia began earning profits from Active Euroworks, (2) that [appellant] was not harmed by Garcia's operation of Active Euroworks, or (3) that [appellant] simply failed to prove any damages incurred.

*Dandachli v. Active Motorwerks, Inc.*, No. 03-19-00494-CV, 2021 WL 3118437, at *6

(Tex. App.—Austin July 23, 2021, no pet.) (mem. op.).

## C. Law on Loss-of-Use Damages

No rigid rule applies when determining loss-of-use damages. *Canyon Vista Prop. Owners Ass'n, Inc. v. Laubach*, No. 03-11-00404-CV, 2014 WL 411646, at *5 (Tex. App.—Austin Jan. 31, 2014, no pet.) (mem. op.). Instead, factfinders must consider the particular circumstances of the plaintiff and the facts of each case in assessing loss-of-use damages. *Id.*

The Texas Supreme Court has set forth the following broad parameters on loss-of-use damages:

As with all consequential damages, the availability of loss-of-use damages is necessarily circumscribed by common[ ]sense rules. To begin with, the damages claimed may not be "too remote." This is not to say they must be "the usual result of the wrong," but they must be foreseeable and directly traceable to the tortious act. The damages also must not be speculative. Although mathematical exactness is not required, the evidence offered must rise above the level of pure conjecture. Moreover, the damages may not be awarded for an unreasonably long period of lost use. Whether framed as a duty of mitigation or a doctrine of avoidable consequences, the principle is the same: A plaintiff may not recover loss-of-use damages for a period longer than that reasonably needed to replace the personal property. That principle compels a

46

plaintiff's diligence in remedying his loss and deters an opportunistic plaintiff from dilly-dallying at the expense of the defendant. After all, the role of actual damages is to place the plaintiff in his *rightful* position, not the position he *wishes* to acquire.

*J&D Towing, LLC v. Am. Alt. Ins. Corp.*, 478 S.W.3d 649, 677 (Tex. 2016) (citations omitted).

## D.    What the Record Shows

Appellants pleaded for loss-of-use damages as follows:

27.    As a result of [Velu's] breaches of the [c]ontracts, [Appellants] and [their] other members suffered damages, including [Appellants'] losing use of said funds to pay down the mortgage on the property, pay taxes, and reduce the principal on the loan.

. . . .

30.    As a result of [Velu's] conversion of the property, [Appellants] lost the use of those monies for [their] business purposes, including, but not limited to, paying down the mortgage on the property, paying taxes, and reducing the principal on the loan so as to reduce interest paid on the mortgage over time.

. . . .

34.    [Appellants have] sustained damages as a result [of Velu's theft], including loss of property[] and loss of use of property.

. . . .

46.    As a result of [Velu's] breach of fiduciary duty, theft, and fraud, and [Velu's] breach of contract and conversion, [Appellants] and [their] other members have suffered actual damages in the form of lost income and revenues of at least $350,000, interest on lost use of this amount, and other damages.

During the jury trial, Sengottiyan testified that he believed the net revenue from 2009 to 2014 "was going towards paying off the loan" and that he trusted that Velu was paying down the mortgage with net revenue; in other words, without using the exact wording, it appears that Sengottiyan believed that they were prepaying the mortgage. At the time of the jury trial, Appellants' account had "roughly close to $200,000." Sengottiyan was asked on cross-examination what Appellants had done with the money, and he said that a majority of members had voted "to pay the excess amount towards the loan." When asked what amount was applied to the loan and when, Sengottiyan testified that he did not remember the exact details; he said, "I can tell you we paid one time $50,000 and another time 35-some-thousand. I don't remember the exact numbers, but we can look at the accounts and tell you." Upon further questioning to pinpoint the timing of the payments, Sengottiyan testified, "I think both of them were made either in 2017, I think." On redirect, Sengottiyan agreed that since 2015, during the time that he and Samy had been co-managers, "at times, [they had] paid net revenues towards the mortgage to pay down the mortgage."

The sole finding that the trial court made on this issue was that "the interest [Appellants] sought to recover w[as] damages for the loss of the use of money." The trial court's judgment does not award loss-of-use damages.

**E.    Analysis**

In their opening brief, Appellants raise legal arguments to show that Texas allows recovery of loss-of-use damages,[21] that Appellants had a "right to this award of damages," and that neither the trial court nor Velu presented a viable basis for denying Appellants an award of loss-of-use damages.  They rely on their chart showing an interest calculation[22] on the $130,100 damages found by the jury, but they set forth no evidence to show that they conclusively proved during the bench trial that the stolen money would have been used to pay down the mortgage.  Instead, Appellants state that they conclusively established their "right to this award of damages" and then set forth the following two sentences:

> Sengottiyan testified that during the time when [Velu] was the primary managing member, the expectation was that the net revenues were being used to reduce the loan on the building.  Both Sengottiyan and [Samy] testified that after Sengottiyan replaced [Velu] as co-managing member of [Appellants], the use of accumulated revenue was discussed with [Appellants'] members, and the funds were used to pay down the principal of the mortgage[—]a claim born[e] out by the mortgage account records.  [Record references omitted.]

---

[21]On appeal, Velu does not challenge that Texas recognizes loss-of-use damages as a measure of damages for claims of theft and conversion.  For purposes of our analysis, we therefore assume that such damages were available to Appellants if properly proven.

[22]For disposition of this issue, we need not address the correctness of the interest rates used, but we note that the various interest charts that Appellants reference have different totals:  Plaintiffs' Exhibit 14 shows the total interest as $73,535.38 (though adding the yearly interest column produces a total of $78,048.23), while Plaintiff's Exhibit – Hearing Ex. 1 shows the total interest as $78,045.

Velu points out the following shortcomings in Appellants' theory that the stolen money would have been used to pay down the mortgage because Appellants had made additional mortgage payments "at times" after Velu was removed as co-manager:

> No context was ever provided by [Appellants] for why any payments on [their] mortgage "at times" were actually made and then comparing these circumstances with those that existed during the relevant times at issue in this lawsuit. Stated another way, [] Appellants failed to show that the circumstances allegedly warranting payment "at times" on the mortgage existed at any time when Velu is accused of any wrongdoing, thus allegedly supporting the circumstantial inference that additional payments would have been made as well. Indeed, there is no evidence of the amount [Appellants] would have had in available cash had Velu not taken the $130,100.00; no evidence of how many alleged payments would have been made; how much each such alleged payment would have been; or when each such alleged payment would have been made. Myriad questions abound with regard to Appellants' theory making it nothing more than unsubstantiated innuendo. For example, how much did [Appellants] have at all times? Did the amount exceed $200,000.00? Even if [they] did, did [Appellants] have other debts that [they] needed to pay with this money? Did [they] need to keep a cash reserve for any secured loans to be sufficiently collateralized? What condition was the economy in during the time in question? Was saving for contingencies more important than paying off debt? Were there other opportunities that would yield a greater investment return than retiring the subject mortgage? [Appellants] failed to provide any context whatsoever to prove the findings that were made were clearly wrong and unjust.
>
> Another problem with [Appellants'] theory is that it is totally dependent on the self-serving testimony of its current managers. . . . [Appellants'] witnesses provided no documentary evidence that supported their assertion that [Appellants] intended to use excess cash to pay down [Appellants'] mortgage. Further, the general disinterest of [Appellants'] co-manager, Samy, and [Appellants'] failure to use reasonable care to avoid [their] injuries, undermines the testimony of [Appellants'] managers that there was a plan to pay down the mortgage. Additionally, undermining their credibility is the lack of clear recollection

of the mortgage principal payments that [Appellants] made since Velu's removal. Finally, a fact[]finder could infer from the testimony at trial that the mortgage payments made by [Appellants] were made not as part of a preexisting plan but to bolster [Appellants'] claim for consequential damages.

Appellants filed a reply brief attacking Velu's arguments, describing them as "newly-minted theories." Without citing any authority, Appellants imply that Velu was limited to raising the same arguments that he raised in the trial court because "[t]o the extent they do anything, the [t]rial [c]ourt's findings of fact and conclusions of law (drafted by [Velu]) point to those theories [that he raised in the trial court]." Appellants further contend that "[nowhere] in the factual findings does the [t]rial [c]ourt criticize the evidence presented by [Appellants] as being insufficient to carry [their] burden of proof on this issue." Appellants, however, failed to seek additional findings from the trial court on this issue. As an appellate court, we must assume that any omitted, unrequested findings support the judgment, and we must assume from the trial court's decision to award $0 for loss-of-use damages that the trial court determined that Appellants had failed to conclusively establish their burden on these damages. *See* Tex. R. Civ. P. 299; *Roberson*, 768 S.W.2d at 281; *Williams*, 352 S.W.2d at 795.

Appellants also argue in their reply brief that this court cannot imply a finding regarding the credibility of Appellants' witnesses' testimony. Yet, we must defer to the trial court's credibility determinations and cannot substitute our judgment for the trial court's assessment of witnesses' testimony in a bench trial. *See 12636 Rsch.*, 2021

51

WL 417027, at *5. Here, the trial court's judgment awarding $0 for loss-of-use damages implies that it did not find Appellants' witnesses' testimony credible; thus, we defer to that decision on the credibility of Appellants' witnesses' testimony.

Appellants' reply brief further contends that Velu urges this court to apply a higher burden than Texas law requires by asserting that Appellants had to prove that money taken by Velu would have been used to pay down the mortgage. Appellants argue that they are required to establish their damages with "reasonable certainty," not mathematical precision, and that they need only show "a reasonably foreseeable use of funds wrongfully" taken. Reasonable certainty, however, is not the question; the question is one step removed: it is whether Appellants credibly proved that they had incurred loss-of-use damages. Based on the limited testimony provided, which amounted to mere conjecture, Appellants failed to conclusively establish that they had incurred loss-of-use damages.

Within this same argument, Appellants contend that "[r]equiring proof that the money would have been used in a certain way imposes an impossible burden on [Appellants]." Appellants, however, were the ones who pleaded that they had "lost the use of those monies for . . . business purposes, including, but not limited to, paying down the mortgage on the property." Moreover, the burden was not an impossible one as the trial court could have believed Appellants' witnesses' testimony; it simply chose not to.

Appellants' final reply is that "[Velu]'s claim that the proof consists solely of 'self-serving' testimony is incorrect." Appellants point to bank records, arguing that they show that funds in Appellants' possession after Velu was removed from handling money were used to prepay the mortgage debt. Such evidence of prepaying the mortgage in 2016 and 2017, however, does not conclusively establish that Appellants had any intention of prepaying the mortgage in 2009 to 2010—the initial years after the LLCs were formed.

After reviewing the record under the required standard of review and analyzing the arguments raised, we conclude that Appellants' legal sufficiency challenge fails. For Appellants to prevail on their claim for loss-of-use damages, they had the burden to conclusively establish their entitlement to interest for the loss of use of the stolen money. Appellants' evidence on loss-of-use damages was not conclusive; the testimony about after-the-fact uses of the money seven to eight years after the money was stolen amounted to mere conjecture as to how any net revenue would have been used in 2009 and 2010. Neither Samy nor Sengottiyan testified that there were general meetings of the members during 2009 and 2010 in which they voted to pay down the mortgage; the only testimony was that Sengottiyan "believed" that the net revenue was being used to pay down the mortgage from 2009 to 2015.

Accordingly, we hold that Appellants failed to conclusively prove that they suffered any loss-of-use damages, and thus the trial court did not err by determining that Appellants should be awarded $0 for loss-of-use damages. *Cf. Wiese v. Pro Am*

53

*Servs., Inc.*, 317 S.W.3d 857, 863–64 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (holding that there was no legally sufficient evidence proving appellee's loss-of-use damages where appellee failed to provide competent evidence that it was entitled to recover loss-of-use damages consisting of lost profits); *Automek, Inc. v. Orandy*, 105 S.W.3d 60, 65 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (stating that "[w]ithout any evidence, an award for damages for loss of use must be based upon conjecture and is thus impermissible" and holding that the evidence was legally insufficient to hold that appellee had suffered loss-of-use damages). We overrule Appellants' second issue.

## VII. Breach-of-Fiduciary Ruling Not Explicit in Judgment

As mentioned above, at the conclusion of the evidence in the jury trial, Appellants moved for a directed verdict on both the existence of a fiduciary duty owed to Appellants by Velu and Velu's breach of that duty. The trial court granted the motion for directed verdict. After the final judgment was rendered, Appellants filed a motion to correct the final judgment, requesting the trial court to "identify this cause of action or ruling in the [f]inal [j]udgment," but the trial court denied the motion.

In their fifth issue, Appellants request this court to modify the final judgment to reflect that the trial court granted a directed verdict in their favor on their breach-of-fiduciary-duty claim. Concluding that there was no abuse of discretion, we decline to do so. *See Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 194 (Tex.

54

App.—Houston [14th Dist.] 2002, no pet.) (stating that the trial court's interlocutory ruling granting a directed verdict on the entire breach-of-fiduciary-duty claim merged into the trial court's final judgment). *See generally Wagner v. Edlund*, 229 S.W.3d 870, 879 (Tex. App.—Dallas 2007, pet. denied) (stating that appellate courts review the denial of a motion to modify, correct, or reform a judgment for an abuse of discretion). The record reflects that the jury charge sought to have the jury assess damages solely for theft, conversion, and breach of contract; there was no question asking the jury to assess damages related to the breach-of-fiduciary-duty claim, and there were no objections to the charge. Thus, there was no damage award for the breach of fiduciary duty. Accordingly, we overrule Appellants' fifth issue.

## VIII. Conclusion

Having sustained Appellants' third issue because the trial court failed to follow the steps set out in *Rohrmoos* for calculating trial attorneys' fees and because the trial court failed to award any appellate attorneys' fees despite that Appellants were entitled to an award of appellate attorneys' fees, we reverse and remand for a new trial solely on attorneys' fees. Having overruled Appellants' first, second, fourth, and fifth issues, we affirm the remainder of the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: November 4, 2021

55